WBSR, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 64637.    Filed June 27, 1958.

*Scott P. Crampton, Esq.*, for the petitioner.
*Thomas E. Tyre, Esq.*, for the respondent.

The Commissioner determined deficiencies in petitioner's income tax for the years 1951, 1952, and 1953 in the respective amounts of $1,334.43, $3,423.42, and $821.18.   The deficiency for 1951 is due to

two adjustments which the Commissioner made to the net income reported by petitioner on its return for that year. These two adjustments were:

(a) Depreciation_____ $2,936.43
(b) Net operating loss_____ 1,705.07

Adjustment (a) is explained in the deficiency notice as follows:

(a) It is held that, of the $44,000.00 paid for the property known as radio station WBSR, $16,347.27 represents the cost of an intangible asset no portion of which is subject to the allowance of a deduction for depreciation under section 23 (1) of the Internal Revenue Code of 1939. The correct allowable deduction for depreciation for the year 1951 therefore is $3,153.37 as set forth in Exhibit A attached hereto, in lieu of the $6,089.80 claimed on your return.

Adjustments similar to adjustment (a) described above for 1951 were made to the net income as reported by petitioner for the years 1952 and 1953. These adjustments were explained in the deficiency notice in the same manner as for the year 1951.

Adjustment (b) is explained in the deficiency notice as follows:

(b) The net operating loss deduction claimed on your 1951 income tax return representing the net operating loss carry-over from the year 1950 is decreased by $1,705.07 which is composed of the following adjustments: [Here three items are set out which aggregate $1,705.07. It is deemed unnecessary to set these items out in detail in view of what the parties have stipulated as to the net operating loss of petitioner for the year 1950.]

Petitioner assigns errors as to the determination made by the Commissioner as follows:

(a) In computing the net operating loss carryover from 1950 to 1951 respondent has erroneously failed to allow petitioner a deduction of $2,000.00 for rent paid by petitioner in 1950.

(b) The respondent has erroneously reduced the depreciation deductions to which petitioner is entitled in the years 1951, 1952, and 1953 by reducing the cost bases of tangible assets purchased by petitioner in 1951.

(c) The respondent has erroneously attributed $16,347.27 of the purchase price of the physical assets acquired in 1951 to an alleged intangible asset.

FINDINGS OF FACT.

A stipulation of facts has been filed and is incorporated herein by this reference.

Petitioner, a Florida corporation, with its principal place of business in Pensacola, Florida, filed its Federal corporation income tax returns for the years 1951, 1952, and 1953 with the district director of internal revenue, Jacksonville, Florida.

During 1946 and 1947, radio station WBSR, Pensacola, Florida, was operated by a partnership and for the years 1948 and 1949 and part of 1950, by a successor corporation known as Escambia Broadcasting Company, hereinafter sometimes referred to as Escambia. The partnership and Escambia realized profits (or losses) as follows:

| Year | Amount |
|------|--------|
| 1946 | ($11, 190. 66) |
| 1947 | 5, 974. 52 |
| 1948 | (9, 124. 81) |
| 1949 | (6, 405. 23) |

In the fall of 1948, the owners of Escambia requested a broker to try to arrange a sale of WBSR. The broker was unable to sell the station and in January 1949, the broker received a letter from Escambia revoking his authorization and stating in part as follows:

Now this letter today is to say that it is just as well if the papers had been lost! I say this because the radio picture here has worsened and because I know other new factors that would give us no chance of realizing any benefit in working together on the sale of WBSR.

It would hurt your splendid reputation in the radio field to recommend a sale, and it would hurt mine to endorse one that cannot possibly result in anything but a loosing [sic] operation.

The only way out of my difficulty is that I might be able to give the "bare bones" away, and try to salvage something on equipment. If I can let go of this "tiger", I would consider myself lucky not to loose [sic] more money and worry.

In the spring of 1950, Don Lynch and Patt McDonald, who had been trying to buy a radio station in Mississippi or Texas, began negotiations with Escambia for the acquisition of WBSR. Lynch and McDonald inspected the books of Escambia and realized that it had suffered losses in previous years. They examined the physical assets and found that the age of the various assets varied. They also learned that the radio transmitter had been constructed by Escambia's own employees under the direction of Escambia's chief engineer.

On May 8, 1950, a written agreement entitled "LEASE AND OPTION" was entered into between Escambia, lessor, party of the first part, and Lynch and McDonald, lessee, party of the second part. The agreement provided, *inter alia:*

That the First Party for the consideration hereinafter mentioned and set forth, hereby leases to the Second Parties property known as Radio Station WBSR near Pensacola, Florida in Escambia County. A description of the land on which said Radio Station is located is hereto attached, * * *

First Party also leases to the Second Parties all of the personal property belonging to and connected with the said Radio Station. A complete list of the personal property covered by said lease is hereto attached, * * *

The consideration for said lease is as follows:

The sum of Four Thousand ($4000.00) Dollars, which shall be payable in twelve (12) monthly installments, each in the sum of Three Hundred Thirty-Three and 33/100 ($333.33) Dollars payable in advance, the first of said installments being due and payable five (5) days after the approval of this lease by the Federal Communications Commission, and one (1) monthly thereafter until all are paid.

[Second Parties permitted to assign lease to partnership or corporation but shall remain liable in event of default of assignee.]

Second Parties and First Party will apply to the Federal Communications Commission for approval of this lease and option, and fees for approval of this lease and option are to be paid by the Second Parties. Subject to written approval of said application by the Federal Communications Commission, First Party agrees to continue said Radio Station in operation until the application referred to is acted upon by said Commission; and to assume all responsibility for said operations during such time and until Second Parties take possession pursuant to such order of the Federal Communications Commission.

[Cash on hand and accounts receivable are expressly excluded from the Lease and Option and shall remain the property of the First Party.]

The Parties further agree:

That it is the intent of the parties to lease and option the physical properties and that the assignment of the license is a matter separate and apart from the matter of the physical properties.

That the First Party shall retain no right to or interest in said license or any right of reversion in said license after it is assigned to Second Parties by action of the Federal Communications Commission, and that said Second Parties may thereafter deal with said license independently of said First Party.

* * * [U]ntil such time as the Federal Communications Commission shall approve an application for the assignment of the license from First Party to Second Parties the said First Party shall continue to manage the said Radio Station and shall exercise full control over the Station * * *

[First Party to take possession in event of default in payment of rent by Second Parties.]

It is further agreed between the parties hereto that at the expiration of the leased premises (the option to purchase hereinafter given not having been exercised) that Second Parties or their assignee will return and deliver to First Party the above described property in as good condition as when received, ordinary wear and tear excepted.

*       *       *       *       *       *       *

It is further understood and agreed that the Second Parties shall carry out all contracts now in existence between the First Party and patrons of said Radio Station. A list of said contracts so assumed is hereto attached, * * * the Second Parties shall have the right to retain all payments made pursuant to said contracts, from and after the effective date of this lease.

[First Party shall continue in effect the policies of insurance on the leased premises.]

It is further understood and agreed that this lease shall not be binding, valid or effective until the same has been approved by the Federal Communications Commission; but in the event said approval is obtained Second Parties or their assignee shall take possession of the leased premises within a reasonable time after the date of said approval, not to exceed fourteen (14) days, and said lease shall become operative from the date of taking possession of said leased premises. Both parties hereto agree to cooperate fully and completely in doing everything necessary and proper to obtain approval of said lease and operation by the Federal Communications Commission.

For the ADDITIONAL CONSIDERATION of the sum of Ten ($10.00) Dollars cash in hand paid, and other good and valuable considerations, including the operation of said radio properties during the existence of said lease, the First Party hereby grants to the Second Parties, or to its assignee, an exclusive option to purchase all of the property referred to in this lease, and fully described in Exhibits "A", "B", and "C" hereto, at and for the sum of Forty-Four Thousand

($44,000.00) Dollars. Said option may be exercised either by the Second Parties or their assignee by giving written notice to the First Party, by registered mail return receipt requested or to Ruth Braden as president of First Party at the last known place of address of either; and, upon the exercise of said option, and the approval by the Federal Communications Commission of the transfer of said wave length, call letters and all other property covered by said Exhibits hereto attached, the Second Parties or their assignee shall give eight (8) good and valid promissory notes, each in the sum of Five Thousand ($5,000.00) Dollars, the first of said notes being payable on the date of approval of the transfer by the Federal Communications Commission and one (1) annually thereafter on or before the annual due date until all are paid. Said notes shall be secured by a mortgage upon the real estate described on Exhibit "A" hereto. Said notes shall bear six percent (6%) interest from date until paid. It is understood and agreed that, in the event of the exercise of said option by Second Parties or their assignee, that any payments of rent made under this lease shall constitute part payment on the first of said promissory notes, and shall be credited accordingly. It is further understood and agreed that all of said notes, except the last two (2) shall be negotiable; that the said last two (2) promissory notes shall be non-negotiable. In the event of the exercise of said option to purchase, and the approval of the transfer by the Federal Communications Commission, First Party hereby agrees and undertakes to convey all of said property free and clear of all claims, debts, taxes, and demands of any kind or character; and it is further understood and agreed that said last two (2) promissory notes representing part of the purchase price are hereby made non-negotiable so that Second Parties may credit against said notes any sums which it or its assignee is required to pay which sums may be liabilities of the First Party which First Party has not paid. Party of the First Part agrees to assume any liabilities that have been incurred, or may hereafter be imposed upon the First Party or Second Parties, by decision of the National Labor Board, for any alleged violation of contracts between First Party and the International Brotherhood of Electrical Workers, A. F. of L., of which contracts both parties have knowledge. The purpose of this provision is to insure Second Parties acquiring said premises free and clear of all debts, liens, claims, demands, or liabilities. In the event said option is exercised, the said transfer approved by the Federal Communications Commission, then Second Parties, or their assignee shall immediately execute and deliver to First Party said promissory notes, which shall thereafter become valid and binding; but in the event said Federal Communications Commission does not approve said transfer to Second Parties or its assignee, then no obligations of any kind or character shall be imposed upon Second Parties or their assignee by reason of their seeking to exercise said option, and in that event the leased properties shall be returned to the First Party as provided in said lease.

    \*       \*       \*       \*       \*       \*       \*

The term of this lease shall be for a period of one (1) year from and after the approval of this lease and permission to transfer as granted by the FCC. The option herein granted may be exercised at any time during the term of said lease or prior thereto, provided that, if exercised, notice shall be given ninety (90) days before the expiration of said lease, the exercise of said option being subject to approval by the FCC, as hereinabove provided. In the event said approval is not obtained before the expiration of this lease, then the lease shall be extended in all its terms until said FCC approves or disapproves said transfer. If disapproved, the rights of Second Parties hereunder shall terminate.

[Three exhibits attached to the Lease and Option described the real estate, equipment and furniture, and contracts which the Lease and Option covered.]

Petitioner was incorporated on May 18, 1950. Petitioner issued 90 shares of its total authorized capital stock of 100 shares which were held during the years involved as follows:

| Holder | Number of shares | Amount |
|---|---|---|
| Don I. Lynch, President and Treasurer | 25 | $2,500 |
| George Mooney, Vice President | 10 | 1,000 |
| Abe Waldauer, Secretary | 20 | 2,000 |
| Patt McDonald, Director | 30 | 3,000 |
| D. F. and Janet Prince, Director | 5 | 500 |
| | 90 | 9,000 |

At the first meeting of petitioner's incorporators on May 20, 1950, McDonald and Lynch offered to assign the Lease and Option agreement to petitioner. Petitioner accepted and the assignment was made on the same day.

On July 6, 1950, the Federal Communications Commission, hereinafter referred to as F. C. C., consented to the assignment of the station license to petitioner by Escambia.

Shortly thereafter petitioner took over the operation of the radio station, i. e., it continued the business as it was operated by Escambia. At the outset petitioner encountered labor troubles but a solution was reached later in 1950. Also, at the outset petitioner lost its network affiliation with the American Broadcasting Company. However, it affiliated with the Mutual Network for a while and later in the year it entered into a contract with the Columbia Broadcasting Company.

Petitioner, during 1950, paid Escambia $2,000 as rent under the Lease and Option.

About April 1951, the petitioner exercised the option to purchase, as provided in the Lease and Option.

Petitioner's net income (or loss) as shown on its returns is as follows:

1950 _____ ($4,224.40)
1951 [1] _____ 9,551.21
1952 _____ 24,459.31
1953 _____ 16,793.85

[1] Before net operating loss deduction.

As of July 1, 1950, shortly before petitioner took over operation of the station, the physical assets referred to in the Lease and Option were shown on the books and records of Escambia as follows:

| Assets | Cost |
|---|---|
| Land | $1,177.75 |
| Building | 3,400.00 |
| Radio tower | 9,237.14 |
| Radio transmitter | 9,181.30 |
| Furniture and equipment | 4,656.54 |
| | |
| Total cost per books | 27,652.73 |
| Less depreciation | 11,123.31 |
| | |
| Net cost per books | 16,529.42 |

In addition to the assets Escambia had a number of recordings which it also transferred to petitioner without additional consideration.

Petitioner, on its returns, showed the fixed assets transferred from Escambia and the depreciation thereon as follows:

| Assets | Cost per return | Depreciation | |
|---|---|---|---|
| | | 1950 | 1951 [1] |
| Land | $1,500 | 0 | 0 |
| Building | 4,500 | $112.50 | $225.00 |
| Radio tower | 10,000 | 333.33 | 666.67 |
| Radio transmitter | 23,000 | 2,300.00 | 4,600.00 |
| Furniture and equipment | 5,000 | 250.00 | 500.00 |
| | 44,000 | 2,995.83 | 5,991.67 |

[1] The same amount claimed for 1951 was also claimed for 1952 and 1953.

Schedule L (balance sheet) of petitioner's 1951 return included a balance sheet at December 31, 1950, which shows the fixed assets held under the Lease and Option as assets with a cost of $44,000, less depreciation, and a liability of $42,000.02.

The respondent partially disallowed the depreciation claimed on the assets acquired from Escambia. The disallowance was based on the Commissioner's determination that "of the $44,000.00 paid for the property known as radio station WBSR, $16,347.27 represents the cost of an intangible asset no portion of which is subject to the allowance of a deduction for depreciation under section 23 (1) of the Internal Revenue Code of 1939." The Commissioner's determination of cost is as follows:

| Assets | Date acquired | Cost per return | Adjustments [1] | Adjusted cost [2] |
|---|---|---|---|---|
| Land | July 1, 1950 | $1,500 | $322.25 | $1,177.75 |
| Building | July 1, 1950 | 4,500 | 1,100.00 | 3,400.00 |
| Radio tower | July 1, 1950 | 10,000 | 762.86 | 9,237.14 |
| Radio transmitter | July 1, 1950 | 23,000 | 13,818.70 | 9,181.30 |
| Furniture and equipment | July 1, 1950 | 5,000 | 343.46 | 4,656.54 |
| | | 44,000 | 16,347.27 | 27,652.73 |

[1] Treated as cost of nondepreciable intangibles.
[2] These amounts are equal to the cost, unadjusted for depreciation, on the books of Escambia, *supra.*

The $2,000 paid by petitioner to Escambia in 1950 constituted rentals or other payments required to be made as a condition to the continued use or possession, for purposes of trade or business, of the physical properties of Escambia to which it (petitioner) did not take and was not taking title and in which it (petitioner) had no equity.

The fair market value of the physical assets of Escambia at the time of petitioner's exercise of its right to purchase was at least $42,000. The fair market value of Escambia's F. C. C. license, if any, was negligible. Escambia possessed no going concern value.

Petitioner purchased the physical properties of Escambia when it exercised the option in the Lease and Option in April 1951. The purchase price is attributable only to the physical assets of Escambia as set forth in the Lease and Option.

The last three paragraphs of the stipulation of facts read as follows:

12. It is agreed that there is no dispute between the parties in regard to the estimated useful lives shown on the returns for the assets, the depreciation of which is in issue.

13. It is agreed between the parties that if the Court finds that the assets in issue had a value of $42,000, as claimed in the petition, then an adjustment will be made to reduce the cost of the Radio Transmitter to $21,000 and depreciation will be computed accordingly thereon.

14. If the Court determines that petitioner is entitled to a deduction of $2,000 for rent, in lieu of the amount claimed as depreciation for 1950, as claimed in the petition, it is agreed that, if petitioner is entitled to a net operating loss carry-over to 1951, said carry-over will be in the amount of $2,975.46.

#### OPINION.

BLACK, *Judge:* The two issues involved herein, viz, whether petitioner is entitled to a net operating loss carryover from 1950 and the amount thereof, and whether the basis for depreciation of the physical assets purchased from Escambia is $42,000, are both dependent upon the effect given to the transaction between petitioner and Escambia.

Escambia, the owner and operator of radio station WBSR, incurred losses during most of its period of operation and, at least in late 1948 and early 1949, was eager to sell out. On May 8, 1950, McDonald and Lynch, who were seeking to buy a station, entered into a Lease and Option agreement with Escambia providing for a lease of the physical properties for a period of 1 year at a rental of $4,000 ($333.33 per month) with an option to purchase the physical properties for $44,000, less any rent paid. This Lease and Option was assigned to petitioner when it was organized in May 1950. The Lease and Option provided that the assignment of the F. C. C. license was a matter separate and apart from the assignment of the physical properties which the Lease and Option covered and further that Escambia "shall

retain no right to or interest in said license or any right of reversion" after it is assigned to petitioner by F. C. C. and that the petitioner "may thereafter deal with said license independently of" Escambia. In July 1950, the F. C. C. approved a transfer of the license and petitioner took control of the premises. After encountering some difficulties in 1950, petitioner began to operate successfully and in April 1951, it exercised the option to purchase.

On its return petitioner treated the transaction as a purchase of physical properties in 1950 for $44,000 and claimed depreciation on that basis. Although in computing its net operating loss for 1950 to be carried over to 1951 petitioner took depreciation on the property as though it had purchased it in 1950, petitioner now concedes this was error. Petitioner contends that in computing the amount of its net operating loss for 1950 it should be allowed as a deduction for rent paid in that year, $2,000. It concedes it is not entitled to any depreciation on the property for 1950. Respondent determined that about $16,000 of the purchase price should be attributed to nondepreciable intangibles. He accordingly reduced the basis of the depreciable assets and partially disallowed the claimed depreciation for all the taxable years. Petitioner now claims that it is entitled to a $2,000 deduction for rent in 1950 and that its basis for the physical properties was $42,000, i. e., the amount that it paid in 1951, the year in which the option to purchase was exercised.

Petitioner contends that the Lease and Option was what it purported to be and that the amounts paid in 1950, prior to the exercise of the option, were rent and that when the option was exercised only the physical properties were purchased. Respondent, on the other hand, argues that it was the intent of the parties to consummate a sale at the time the Lease and Option was entered into and that despite the provisions of the Lease and Option a portion of the consideration was paid for the license, goodwill or going concern value, and other nondepreciable intangibles.

We think that the record sustains the petitioner's view of the transaction. Petitioner's general manager, Don Lynch, who was an original party to the Lease and Option, testified that they wanted to operate the station for a year on a "wait and see" basis and that when business looked more promising in the spring of 1951, petitioner decided to exercise the option. He also testified that he and McDonald, the other promoter of the petitioner, after looking at several radio stations, thought that the physical assets of Escambia were worth the price paid. An expert witness, who actually tried to sell the same station around 1948–1949, appraised the property and testified that the fair market value of the physical assets at the time the option was exercised was in excess of the purchase price provided for in the Lease and Option.

Respondent argues that this testimony should be rejected, contending that a license to operate is valuable and that Escambia would not have transferred the license unless it was clearly understood that the option would be exercised. However, the value of a license, if any, is not fixed but is dependent on many facts and circumstances. And all of the facts in the record indicate that if the license did have any value it was negligible. A letter written by the president of Escambia to a broker about 15 months prior to the Lease and Option indicates that Escambia considered the license valueless at that time. Between that time and the time when the Lease and Option was entered into Escambia continued to operate at a loss. Escambia's poor operating record suggests a lack of goodwill or going concern value. We think the evidence sustains petitioner's contention that when it exercised its option to purchase in 1951, it paid nothing for goodwill. Respondent produced no testimony at the hearing to contradict the testimony of petitioner's president, Don Lynch, and its expert witness, James W. Blackburn, that the physical properties purchased had a fair market value fully as much as was paid for them. In fact, Blackburn testified that the fair market value of the assets was $46,000 when acquired by petitioner under the option in 1951.

There is no evidence of a secret agreement or an additional understanding between Escambia and petitioner. See *Gilbert* v. *Commissioner*, 248 F. 2d 399, 402 (C. A. 2, 1957).

Since we think that the Lease and Option actually reflected the transaction, it follows that the $2,000 paid under the agreement in 1950 constituted "rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity," and is deductible under section 23 (a) (1) (A), I. R. C. 1939.

We think it is proper to point out here that we do not understand that respondent contends that the $4,000 rental for the term of the lease, 12 months, is excessive if we should hold that under the terms of the contract and the intention of the parties, it is rent. We have so held. Furthermore, the amount was less than the depreciation on the property for the period. Hence, we have no such situation before us as was present in *D. M. Haggard*, 24 T. C. 1124 (1955), affd. 241 F. 2d 288 (C. A. 9, 1956), where we held that the so-called rental payment of $12,000 by the taxpayer for the year 1949 was excessive in relation to the fair market value of the property and that the taxpayer intended to and did acquire an equity in the property. Under the facts we have present in the instant case, we do not think the *Haggard* case, *supra*, is applicable or controlling.

Of course, it naturally follows that if petitioner is entitled to deduct the $2,000 as rentals, it is not entitled to any deduction for deprecia-

tion on the property in 1950. As a matter of fact, the parties have stipulated that:

If the Court determines that petitioner is entitled to a deduction of $2,000 for rent, in lieu of the amount claimed as depreciation for 1950, * * * it is agreed that, if petitioner is entitled to a net operating loss carry-over to 1951, said carry-over will be in the amount of $2,975.46. ·

The evidence convinces us that petitioner purchased only physical assets in 1951 when it exercised the option. The $42,000 paid in 1951 should be attributed solely to the physical assets. No portion is attributable to intangibles as determined by the respondent. The depreciation on the properties acquired from Escambia should be recomputed under Rule 50, using petitioner's cost as the basis. See secs. 23 (n), 114 (a), 113 (a) and (b), I. R. C. 1939.

As to the right of petitioner to carry forward a net operating loss from 1950 to 1951, we do not understand respondent to dispute petitioner's right to do so. For example, respondent in his brief says: "Petitioner is not entitled to a net operating loss carryover from 1950 to 1951 in excess of that allowed by respondent." This is, in itself, an admission that petitioner is entitled to carry over a net operating loss from 1950. Respondent, in his deficiency notice, in determining the deficiency in petitioner's income tax for 1951, allowed petitioner a net loss carryover from 1950. He merely decreased it from the amount which petitioner claimed on its return. As we have already said, it has now been stipulated that petitioner's net operating loss carryover from 1950 shall be $2,975.46, if we sustain petitioner in its contention that it is entitled to a rental deduction of $2,000 in 1950. This we have done. Therefore, the $2,975.46 agreed to in the stipulation should be used as the net loss carryover from 1950 in a recomputation under Rule 50.

*Decision will be entered under Rule 50.*