**GEM, INCORPORATED, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. W–C–18–60.**

United States District Court
N. D. Mississippi, W. D.

March 31, 1961.

Clifford C. Chittim and Warren V. Ludlam, Jr., Watkins, Pyle, Edwards & Ludlam, Jackson, Miss., and W. C. Adams, Corinth, Miss., for plaintiff.

Leon W. Vaseliades, Attorney, Trial Section Tax Division Department of Justice, Washington, D. C., B. Euple Dozier, Asst. U. S. Atty., Oxford, Miss., for defendant.

CLAYTON, District Judge.

In this action tried to the court and submitted on briefs, plaintiff seeks to recover from the United States income taxes and interest which it claims were wrongfully assessed and collected in the following amounts for each of the following years, to wit:

| | |
|---|---|
| 1954 | $ 436.67 |
| 1955 | $1,473.59 |
| 1956 | $2,988.06 |

Plaintiff also seeks to recover interest from the date of the payment of said sums which date is fixed at February 9, 1959.

On July 11, 1952, plaintiff executed as lessee a lease contract with Marshall County, Mississippi, for a primary term of twenty years with options to renew for three additional twenty-year periods and one additional nineteen-year period. Marshall County issued $100,000 worth of its general obligation bonds which were dated October 1, 1952, and these were sold. On October 11, 1952, the lessor county acquired title to approximately 3¾ acres of land and built a building on this property in accordance with plaintiff's plans and specifications. This building contained approximately 20,000 square feet and is a tilt-up concrete and steel structure. Plaintiff, acting independently, purchased with its own funds approximately 8½ acres of land adjoining the land owned by the county and also arranged with the City of Byhalia, Mississippi, to have a water tank built adjoining the plant, agreeing to pay one-half the cost thereof by water bills over a twenty-year period.

On January 14, 1955, plaintiff executed a contract with the Third Supervisors District of Marshall County, Mississippi, and thereafter general obligation bonds of that district were issued and sold in the amount of $50,000 to finance construction of an addition of approximately 18,000 square feet to the original building. Plaintiff executed as lessee a lease contract with said Third Supervisors District on March 13, 1957, for this addition with a primary term of seventeen years extending from the 1st day of October, 1955, and with renewal options coinciding with the renewal options of the lease of the original building. A short time after this, plaintiff again expanded its facilities.

These projects were undertaken under the provisions of the Mississippi Balance Agriculture With Industry legislation (§§ 8936–8936–41, Mississippi Code 1942, Recompiled). This law is administered by the Mississippi Agricultural and Industrial Board, and the contracts and leases in question were executed in conformity with the established general policy of said Board, which was and is to require that lessees, under such contracts, should be required to pay such annual sums as would enable the public agencies issuing the bonds, to pay the principal and interest on such bonds as they mature. Thus, in the leases and bonds with which we are concerned, maturity schedules and rental payments were so arranged that with respect to the first lease, rental payments would completely pay and retire the bonds and the interest coupons thereon over the twenty-year primary term therefor and with respect to the second lease, rental payments required would pay the bonds and the interest coupons thereon over its seventeen-year primary term.

In addition to its obligation to pay the rent, the lease agreements placed upon plaintiff the obligation of continued operation of a manufacturing plant of the character described by the leases so as to provide employment in the community. This is the over-riding public purpose of the state laws aforementioned and is an obligation read into such contracts by the Supreme Court of Mississippi, even in those instances where no reference is made to continued operation in the actual written contract itself. In the leading case, in which the constitutionality of said laws was established, Albritton v. City of Winona, 181 Miss. 75, 105–106, 178 So. 799, 807, 115 A.L.R. 1436; appeal dismissed, Allbritton v. City of Winona, Miss., 303 U.S. 627, 58 S.Ct. 766, 82 L.Ed. 1088, the Supreme Court of Mississippi said:

> "If the statute permits a lease of the property that would strip it of the purpose for which the statute permits its acquisition, as hereinbefore outlined, and permitted it to be devoted wholly to private purposes, the tax to be levied in order to pay the bonds, by the sale of which the money for purchasing the property is to be obtained, would then not be for a public purpose but in aid of private individuals, which under due process of law cannot be done. The statute does not so permit, for in all its parts it contem-

plates that the proposed industry shall be operated for the accomplishment of the purposes outlined therein, either by the municipality itself or, if the municipal authorities and the Mississippi Industrial Commission [1] deem best, by a lessee under a lease containing 'such terms and conditions and with such safeguards as will best promote and protect the public interest'. The lease, therefore, must be of such character *as will insure the continued operation of the proposed industry with power in the municipality, under the supervision and control of the Mississippi Industrial Commission,* to enforce the continued operation; in other words, the character of the lease is to be such as, in effect, to constitute the lessee the municipality's agent for operating the industry without liability on the municipality to others growing thereout." (Emphasis added.)

The Court further observed:

"We are not called on, and are without authority, to here specifically set forth and limit the provisions of such leases, and we must presume that the municipal officers and the Mississippi Industrial Commission will take care that the provisions of the leases will meet the requirements of the statute. If they do not, the leases will be void. It may not be amiss, however, to say that one effectual method for preventing the lessee from holding the property without carrying out the purposes for which it was acquired would be *to insert in the lease a clause setting forth the character and capacity of the proposed industry, and providing for the determination of the lease if the lessee fails within a specified time to equip and operate the industry as described in the lease or discontinues for a specified time thereafter to so operate it."* (Emphasis added.)

The contracts and leases with which we are here concerned were drafted with this language in mind. Paragraph "m" of Section 10 of the original contract between plaintiff and Marshall County provides that the lease shall terminate if the premises should be abandoned or the industry cease to operate for a period of one continuous year.

Plaintiff treated the payments made under these lease contracts, for the three years aforementioned, as rental and deducted them in making its return and in computing its income tax liability for those years. A part of these deductions were disallowed and the sums so disallowed were later collected on deficiency assessments, with interest to the date of payment. Refund claims timely filed were denied.

The theory of the disallowance and determination of deficiency was that the disallowed portion of the amounts deducted as rent were for the acquisition of an equity to be recovered by plaintiff through amortization or depreciation deductions over the life of the property involved.[2] Thus, it is necessary to construe a part of § 162 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 162 [3] and regulations issued thereunder pertinent to this inquiry,[4] since these control.

1. Now Mississippi Agricultural and Industrial Board.

2. The useful life of the buildings is approximately 40 years.

3. "§ 162. Trade or business expenses.
"(a) In general.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—
* * * * *

"(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity."

4. Treasury Regulations on Income Taxes (1954 Code):
"§ 1.162–11 Rentals. * * *
"(b) (1) The cost to a lessee of erecting buildings or making permanent im-

To resolve the issue between the parties to this suit, since these leases had not been renewed during the years in question here, only one question of fact need be answered. That question is, "during 1954, 1955 and 1956 was there a reasonable certainty that the leases would be renewed"? This is a factual question, but standards for its answer must be found in law.

As a matter of law, the Board of Supervisors of Marshall County cannot make or be bound by any agreement or contract which is not approved by formal action and entered on its minutes. And, it is without dispute that there were in fact no additional or secret agreements which nullify or modify in any way the contracts and agreements affecting these transactions. Thus, the essential character of each of the lease contracts with which we are concerned, with a governmental agency, whose authority is limited and fixed by statute, must be determined from the contents of the document itself.

The county and the Third Supervisors District have at all times held title to and exercised acts of ownership over the leased premises. Although plaintiff prepared and approved the construction plans for the leased buildings, the construction contracts were between the county and the builder and all costs of construction were paid out of the proceeds of bonds issued by the county and the Third Supervisors District in accordance with the statutory program of the State of Mississippi.

Plaintiff has no option to purchase and is subject to restrictions under state law and under the language of the lease contracts as to occupancy and use and cannot assign or sublet without permission from the Agricultural and Industrial Board. Additionally, from undisputed evidence from a professional appraiser, plaintiff paid no more than a reasonable rental for the right of occupancy and use, and in fact these payments, during each of the years with which we are concerned, *were less than the established fair market rental value for each year.* Thus, it is crystal clear that these rental payments bear a reasonable relation to the fair rental value of the property during the times for which the payments were made. This being true, the words of the Tax Court in Stanley Immerman, 1946, 7 T.C. 1030, at page 1037 have value here. That Court said:

> "Rent paid or incurred during the taxable year is an allowable deduction and the fact that the amount thereof may have been high or low, when considered in the light of current conditions, does not of itself change or affect the amount of the deduction to which the taxpayer is entitled."

In a number of cases where the lessee even had an option to purchase, the courts have determined that the disputed payments were deductible as rent—ordinary and necessary business expense—and were not payments for the acquisition of an equitable interest. In Benton v. Commissioner, 5 Cir., 1952, 197 F.2d 745, 752 where the taxpayers had leased a taxicab business for a period of ten months at a rental of $5,000 per month with an option to purchase at the end of that period for $35,000, in which the Tax Court sustained a determination by the Commissioner of Internal Revenue that the payments constituted a capital investment and his disallowance as rental

---

provements on property of which he is the lessee is a capital investment, and is not deductible as a business expense. * * * Where there is a possibility that the lease may be renewed, the matter of spreading such costs over the term of the original lease, together with the renewal period or periods, depends upon the facts in the particular case, including the presence or absence of an option of renewal and the relationship between the parties. As a general rule, *unless the lease has been renewed or the facts show with reasonable certainty that the lease will be renewed,* the cost or other basis of the lease, or the cost of the improvements shall be spread only over the number of years the lease has to run without taking into account any right of renewal." (Emphasis added.)

deductions, the Court of Appeals for the Fifth Circuit said:

"Whether what is in form a lease is in effect a conditional sales contract depends on the intention of the parties. *The economic relation of the value of the property to the option price is only one factor to be considered in determining intent.* Further that factor must be considered not as of the time for the exercise of the option but rather in the light of the facts and circumstances as they existed at the time when the parties entered into the contract. The property here involved was subject to drastic changes in value for many causes, such as rapid depreciation of the taxicabs, the conclusion of the war, the lifting of governmental controls, etc. *Within the limits of reason, the parties had a right to exercise their own judgment, and that of the Commissioner or of the Tax Court cannot be substituted therefor."* (Emphasis added.)

The Court found in that case that the conduct of the parties throughout was consistent with a lease *even though the option was in fact exercised.* Defendant's position here is analogous to the Commissioner's position in Benton. Since these leases provide an option of renewal at sharply reduced rental payments, defendant assumes that the payments during the primary term must in fact represent payments for the acquisition of an equity in the property. Viewed objectively this attitude amounts to speculation as to the relationship between the rents for the renewal term and the value of the property at that time. Such speculation is not a sound basis for converting payments made and intended as rent by both the parties to these lease contracts into something else quite different. See also Breece Veneer and Panel Co. v. Commissioner, 7 Cir., 1956, 232 F.2d 319; Western Contracting Corporation v. Commissioner, 8 Cir., 1959, 271 F.2d 694; Abramson v. United States, D.C.S.D.Iowa 1955, 133 F.Supp. 677; WBSR, Inc., 1958, 30 T.C. 747.

The common thread running through the foregoing cases is that the taxpayer has a right to deduct as rent, payments made under a lease, even where there was an option to purchase, or a subsequent opportunity to purchase, at a reduced price and that the Commissioner of Internal Revenue may not infer that the parties intended something other than a lease *solely from the fact that taxpayer has some future hope of acquiring title or other advantage.*

Turning now to the regulation, we find the standards established as follows:

" * * * Where there is a possibility that the lease may be renewed, the matter of spreading such cost over the term of the original lease, together with the renewal period or periods, *depends upon the facts in the particular case,* including the presence or absence of an option of renewal and the relationship between the parties. *As a general rule, unless the lease has been renewed or the facts show with reasonable certainty that the lease will be renewed, the cost or other basis of the lease, or the cost of improvements shall be spread only over the number of years the lease has to run without taking into account any right of renewal."* (Emphasis added.)

Under an earlier regulation under an earlier statute which is the same, so far as it is relevant to this case, a clear statement of the principles with which we are concerned was made by the Tax Court in Halsam Products Co., 11 CCH Tax Ct.Mem. 87, 89–90 (1952):

"The rule is clear, as the parties agree, where *improvements* are made by a lessee on leased property held under a lease for an indeterminate period, recovery of costs must be by depreciation over the useful life of the property. Where, however, the lease is for a definite period with no option for renewal, the cost of the

improvement is to be amortized over the remaining term of the lease. In case the lease grants to the lessee a right of renewal or extension, the question as to whether the recovery of the expenditure shall be by amortization over the original term of the lease, or over the life of the property if such is longer than the lease term, *depends upon the facts in the particular case. Unless the lease has been renewed or such facts shown with reasonable certainty that it will be renewed, the cost of the improvement is committed to be recovered over the number of years only the lease has to run,* without taking into account a right of renewal. (Citing cases.)" (Emphasis added.)

"* * * Thus, we have found at the time of the execution of this lease, the conditions facing the petitioner were such that there was no reasonable certainty that the petitioner would occupy the premises longer than the term of the lease."

See also Bonwit-Teller & Co. v. Commissioner, 2 Cir., 1931, 53 F.2d 381, 383, 82 A.L.R. 325; 1620 Broadway Corporation, 1937, 36 B.T.A. 149 and Aiken Drive-In Theatre Corporation, 15 CCH Tax Ct.Mem. 684 (1956). In the last case the lessee constructed a drive-in theatre upon realty leased for a five-year period with an automatic renewal for three additional five-year periods unless notice of termination was given prior to the end of each five-year period. This was construed as an option to renew and in dealing with this, the Court said:

"It is to be noted that the rule laid down in the regulations is that the matter of spreading the depreciation or amortization over the term of the original lease, together with the renewal period or periods, depends upon the facts in the particular case, and that unless the facts show with reasonable certainty that the lease will be renewed, the cost of the improvements shall be spread only over the number of years the lease has to run, without taking into account any right of renewal. *This matter, under the regulations, is to be determined in the light of the conditions existing at the end of the taxable year in question.*"

Thus, it seems that the question of reasonable certainty of renewal must be determined as of the taxable year in question. It is not permissible to project the lease into the future, speculate as to what conditions will then exist, and then on the basis of such speculation determine that a lease will be renewed. *Unless from the facts known during the taxable year in question it can be said with reasonable certainty that an option of renewal will be exercised,* the lessee is entitled to deduct for that year an aliquot portion of the costs of improvements, without taking into account any renewal period. The same rule must necessarily apply to rental payments made under a lease contract with a renewal option.

For the taxable years in question, defendant has made no showing of substance that there is a reasonable certainty that plaintiff will exercise its option to renew, but relies on the sharply reduced rental provided for the renewal term, the fact that plaintiff's president at the inception of these arrangements had confidence enough in the success and continuance of this undertaking to strain his resources to make the principal investment therein, that plaintiff may sublet the premises (but this right must be weighed in the light of the not inconsiderable restrictions placed thereon by the terms of the contracts and by state law), that since the real estate is in the name of the county no ad valorem taxes are required to be paid thereon and no payment is made by plaintiff in lieu thereof and upon the express findings, at the beginning of this enterprise, by the Executive Committee of the Agricultural and Industrial Board and by the Board of Supervisors of Marshall County evaluating plaintiff as a good risk for a project under the Mississippi Balance Agriculture With Industry program.

Defendant also urges that consideration should be given to the fact that plaintiff's output and profits increased during the years in issue; plaintiff's investment in 8½ acres of land adjoining the plant and that the building is the only plant in the area suitable to the taxpayer's business. But, plaintiff is engaged in a branch of the textile industry, producing "housewares" and this is a highly competitive field. Foreign imports, new types of wearing apparel, new household appliances and many other things combine to render unpredictable the future market for plaintiff's products. Moreover, plaintiff's products do not have consumer acceptance by a brand name. For the taxable years in question, approximately two-thirds of plaintiff's sales were to a single customer, who sold the goods under its own brand name. Most of its sales contracts are on a short term basis and result from the personal efforts and personal contacts of its president. If the president should become ill or die, it is probable that these contracts would not be renewed. Plaintiff has no national market which would sustain sales of its products if these contracts were lost. And, since this is a one-man operation, it must be considered that with the weight of the additional years [5] which plaintiff's president will bear at the end of the primary term of these leases, his drive, and energy and force may be, by then, greatly impaired and he might, by then, have lost his genius as a salesman with the contacts which are, at this time, and were, during the years in question, the lifeblood of plaintiff's existence.

There are other factors which may well keep plaintiff from exercising its option to renew. The location of a plant for the manufacture of dust mops and ironing board pads at Byhalia, Mississippi, was and is definitely a venture of an experimental character. Its continued profitable operation is dependent, as has been said, upon securing its share of business which is now largely in the east, the mid-west and the Pacific Coast area. In competition with plants located in or closer to the principal markets, plaintiff is seriously handicapped by the extremely high freight rates on finished goods of the type it manufactures. It has been able to meet this competition because of more favorable labor conditions, but there is no certainty that such conditions will exist in the future. If it fails to operate for a period of one year, its lease is forfeited. Thus, if operations could not be profitably undertaken during such a period, plaintiff would have to *operate at a loss or lose its lease.* It could not close down and await a more favorable market. And, to say that its financial condition, in such event, would permit it to so operate would be guesswork. Under these circumstances, to predict the continued successful operation of plaintiff's venture would be to engage in optimistic speculation and this cannot be said to be equal to a "reasonable certainty" of renewal under the option provisions of these lease contracts.

On the contrary, it appears clear that plaintiff's uncertainty with respect to whether it will renew these lease contracts at the end of that primary term, even though the rental for the extended period may be only nominal, seems bona fide in the light of the circumstances surrounding Byhalia, Mississippi. This is a town with a population of less than 700, according to the 1960 census, with no fire protection and with water available for domestic purposes only. It is located within commuting distance of highly industralized Memphis, Tennessee, and the competition from Memphis for employees within the area to which plaintiff must look for its labor, renders a future labor supply for plaintiff precarious.

To find that there is a reasonable certainty of renewal of the present leases by plaintiff would require an unwarranted overweighing of but one factor, namely, the substantially lower rental provided

---

5. He is now 44 years old.

for the renewal periods,[6] and would further require a minimization of the other factors, some of which have been mentioned, which will ultimately determine whether these options will be exercised. To say this differently, it does not seem reasonable to say that any business would renew any lease for the sole purpose of securing a low rental. Hence, it is impossible to predict a reasonable certainty of renewal and speculation as to the possibility of a renewal will not do.

More certain is that as the premises age, the cost of meeting plaintiff's contractual obligation to maintain and keep in good repair the buildings will rise sharply and that premiums required to meet plaintiff's obligation to keep the premises insured will increase with the age of the buildings and equipment; the likelihood that machinery and leasehold improvements, owned by plaintiff, will be worn out or obsolete so that consideration will have to be given to the advisability of replacing them;[7] and, this is true of the building and improvements furnished by the county which may by the expiration of the primary terms, require modernization of a substantial and expensive character. Should this be true, if this expense were borne by the county, additional rent would be required and if borne by plaintiff, its cash or line of credit position as of that time might be decisive. The facts are that plaintiff would be required to assume, upon renewal, an obligation to continue to operate its plant for a twenty-year period and to maintain a substantial payroll in the community. A failure to meet this obligation would result in cancellation of the lease and the probability of suit against plaintiff for damages. Not yet mentioned is the impossibility of predicting now, or of having made a valid prediction during the years in question, with respect to raw material supplies, freight rates, power rates, taxes and many other similar factors, including general economic conditions at that time, which would, at the end of the primary terms of these leases, affect seriously a decision with respect to the exercise of these renewal options.

No fault is found with the cases cited by defendant and this court accepts as settled that the provisions of written documents are not necessarily conclusive for tax purposes and that the courts look to substance rather than form and may ignore or disregard leases or terms of leases under this principle. West v. Commissioner, 5 Cir., 1945, 150 F.2d 723; Commissioner v. Court Holding Company, 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981; W. H. Armston Company v. Commissioner, 5 Cir., 1951, 188 F.2d 531, 26 A.L.R.2d 698 and Southwestern Hotel Company v. United States, 5 Cir., 1940, 115 F.2d 686. But, here form and substance are the same, and income taxes were not taken into account at all when the leases were negotiated.

The other cases cited by defendant announce correct principles of law, but in all of them the factual situations were different. All of them recognize that a decision "depends upon the facts in the particular case and the relationship between the parties". Here the facts are with plaintiff and the relationship between plaintiff and Marshall County was and is that of lessee and lessor. During the years in question, these options to renew had not been exercised and evidence which would justify this court in saying that there is, in fact, a reasonable certainty that the leases will be renewed or extended beyond their primary terms, as has been said, is almost wholly lacking. The facts here, aforementioned, distinguish this case from the cases relied on by defendant. It follows that this court should

---

6. These contracts establish this annual rental for all of the renewal periods at $100 for the first lease and $50 for the second lease.

7. Of course, plaintiff depreciates this personal property at acceptable annual rates and deducts these amounts for tax purposes. But to assume that a cash reserve for replacement is maintained equal to the amounts of these deductions would be to go beyond the record.

and now does find that plaintiff's deductions of all of the payments made under these lease contracts as rent, for the years in question, were properly deductible as rent and were not amounts expended for the acquisition of an equity, to be recovered through amortization or depreciation deductions over the life of the property or for any period beyond the primary term of these leases.

Plaintiff is entitled to the relief sought in this action and an order may be prepared for entry requiring repayment of the sums sued for, with interest as provided by § 2411, Title 28 U.S.C.