**BREECE VENEER AND PANEL COMPANY, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 11450.**

United States Court of Appeals Seventh Circuit.

April 26, 1956.

Robert Ash, Carl F. Bauersfeld, Washington, D. C., Bernard H. Barnett, Louisville, Ky., of counsel, for petitioner.

Charles K. Rice, Asst. Atty. Gen., George F. Lynch, Lee A. Jackson, Attys., Tax Division, U. S. Dept. of Justice, Washington, D. C., for respondent.

Before SWAIM and SCHNACKENBERG, Circuit Judges, and PLATT, District Judge.

PLATT, District Judge.

This is a petition to review a decision of the Tax Court of the United States, 22 T.C. 1386, affirming deficiencies assessed for the fiscal years ended August 31, 1945, 1946 and 1947 in income taxes of Breece Veneer and Panel Company (hereinafter referred to as taxpayer). The question presented is whether payments made by the taxpayer to the Reconstruction Finance Corporation under a "Lease and Option to Purchase" agreement were deductible as payment of rent in the years involved under 26 U.S.C.A. § 23(a):

"(1) Trade or business expenses

"(A) In general. All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * * ; and rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or

is not taking title or in which he has no equity.".

The Tax Court held that the taxpayer was acquiring an equity in the property and disallowed the rental expenses.

The Tax Court under findings of fact reviewed the evidence, a part of which was admitted by stipulation. The pertinent evidence was substantially as follows:

The taxpayer is an Indiana Corporation, with its principal office at New Albany, Indiana. During the taxable periods involved it was engaged in the manufacture of hardwood plywood for the radio, television and furniture industries. Since 1937 the taxpayer had occupied about 30% of the buildings, equipment and machinery in the plant in question under a month to month lease, at a monthly rental of $700.00. The remainder of the property was leased by Gunnison Housing Corporation, a subsidiary of the United States Steel Corporation.

Prior to December 1, 1943, the R. F. C. had made efforts in numerous ways to sell the New Albany plant. In 1942 they unsuccessfully offered to sell it for $175,-000.00, including machinery and equipment.

In 1941, John T. Breece, as president of taxpayer, wrote the R. F. C. that the taxpayer was "interested in the purchase of our end of the property, including the new power plant at a price of $100,-000.00 paying $6,000.00 in cash, and the balance in equal monthly payments over the next seven years at 4½% interest on the unpaid balance."

In October 1943, Breece again wrote the R. F. C., suggesting a purchase clause with a price to be decreased by excess rents. The R. F. C. submitted a leasing proposition by letter which provided in substance that the taxpayer lease the premises, machinery and equipment for a period of five years starting November 1, 1943 with an option to purchase on terms incorporated in the agreement. It was further proposed in a later letter that there be a sublease to Gunnison with a $500.00 minimum rent, plus a percentage of net sales. Breece answered the letter indicating that they wished more space but did not want to handicap Gunnison and would work out their own arrangement. Gunnison also had proposed to R. F. C. a lease arrangement for the entire plant, by which it would have paid rent ranging from $500.00 to $3,312.50 monthly.

The instant lease and option to purchase was drawn by the R. F. C. and submitted to the taxpayer. The contract was executed effective December 1, 1943. The premises included 17 buildings on 21 acres of land, with woodworking machinery and office equipment. Under the agreement the taxpayer was to pay rent monthly in advance to the R. F. C. in the sum of $20,000.00 per year, for a term of five years, renewable for three additional years. The lease also gave the taxpayer an option to purchase the premises, machinery and equipment for $50,000.00 at the end of the fifth and sixth years, $37,500.00 at the end of the seventh year, and $25,-000.00 at the end of the eighth year.

Under the contract, taxpayer as lessee was to pay all taxes, assessments and insurance, and was to deposit a sufficient amount each month to provide for these payments. (The taxpayer actually paid $440.00 per month for this.) Taxpayer was not to change the nature of its occupancy of the premises, sublet to anyone other than Gunnison, assign or encumber its interest, make alterations, or alter Gunnison's sublease without the prior approval of the R. F. C. in each instance. Taxpayer had the duty to make repairs, with the right reserved by the R. F. C. to do so if the taxpayer did not. The contract also contained the usual clauses for reletting upon abandonment and for default upon nonpayment of rent, and also provided for termination upon lapse of time, reciting liquidated damages for a holdover. Upon loss or destruction by casualty, the R. F. C. could repair or rebuild, with deferment of rent during the untenable period, or terminate the lease and pay taxpayer all insurance proceeds

recovered less specified sums approximating at any time, the sum of rent still due plus the purchase option price. The sublease with Gunnison provided for a term of two years with a privilege to Gunnison to renew for additional six months' periods. The minimum rental was fixed at $500.00 per month, plus a percentage of net sales over $50,000.00 and up to $200,000.00 with a maximum rental of $3,035.00 per month. Gunnison was to use the same machinery but was to occupy less space. Rentals from Gunnison in excess of $500.00 per month were to be paid to the R. F. C. to apply on the rent for the fifth and fourth years.

There were three amendments made to the lease due to the sale of certain machinery not used by the taxpayer. These amounts were to be deducted from the purchase option price, leaving a balance of $48,050.00. The R. F. C. permitted the taxpayer to terminate its sublease with Gunnison in 1945 but Gunnison remained on a month to month basis from June 1, 1946 for $3,000.00 per month for the first four months and $4,000.00 for the fifth month.

The New Albany Marquetry Company, a partnership consisting of substantially the same individuals who controlled the taxpayer, occupied space in the New Albany plant from April 1944 to August 1946 paying $2,500.00 per month rent. It had a net worth in September 1943 of $42,173.21 of which $21,913.87 was in cash. In August 1943, the taxpayer had current assets of $190,830.72 and current liabilities of $151,563.16, but only $735.77 was in cash.

In 1944 the taxpayer purchased United States Treasury Notes in the amount of $50,000.00 to become due in 1947. It also purchased $50,000.00 United States Certificates of Indebtedness in January 1945. In December 1945, it purchased Treasury Bonds bearing 2½% interest, in the amount of $25,000.00.

On July 1, 1947, the taxpayer notified the R. F. C. of its desire to exercise its option to purchase. The R. F. C. showed on its books a balance due of rentals plus the net purchase price, after applying the credits for sale of machinery and the balance remaining in the tax and insurance deposit account. On July 30, 1947, the taxpayer received its quitclaim deed and recorded on its books:

Land .................. $ 1,000.00
Buildings .............. 25,000.00
Machinery & Equipment. .22,050.00

Taxpayer claims error in that the Tax Court erroneously applied the law to the facts, made findings of fact clearly erroneous, and completely disregarded the uncontradicted evidence before it.

The Tax Court concluded that the agreement was in the form of a lease but was in substance a conditional sales contract. The agreement contained all of the usual provisions of a lease with an option to purchase. Conditional sales is a term applied to the sale of personal property. The Tax Court's basis for referring to the contract as a conditional sale appears in the cases it cited, viz.: Judson Mills, 11 T.C. 25; Truman Bowen, 12 T.C. 446; Helser Machine and Marine Works, Inc., 39 B.T.A. 644; Alexander W. Smith, Jr., Executor, 20 B.T.A. 27. In all of these cases the Tax Court had before it a lease of machinery with option to purchase for a relatively small amount. Truman Bowen was decided upon a paraphrase of the definition of conditional sales as set out in the Uniform Conditional Sales Act, Sec. 1, 12 T.C. 446, 459:[1]

*"A lease is substantially equivalent to a conditional sale when the buyer is bound to pay rent substantially equal to the value of the goods and has the option of becoming or is to become the owner of the goods after all the rent is paid. In such a*

[1] This is not the exact language of the Act, but in substance it is the same.

Conditional Sales, 2 U.L.A. Sec. 1, 1922. See discussion at p. 3.

contract 'rent' means the purchase price and possession as 'lessee' means the possession of a buyer under an executory contract of sale. That the buyer, in some cases, has the option of becoming the owner and thus a sale is not sure to take place, is of but small importance, for, as a practical matter, the buyer will always be willing to accept ownership, when he has paid the value." (Emphasis supplied.)

In such cases it is clear that the form of the contract and the use of the words "lease" and "rent" are immaterial but the obvious distinction in each case is that the rent paid was substantially equal to the value of the goods and the buyer was bound to pay this amount. In the instant case the taxpayer was neither bound to pay rent substantially equal to the value of the property to obtain a deed, nor was it sure to become the owner. The amount of the rent after five years lacked the substantial sum of $50,000.00 to make the taxpayer the owner. The Tax Court also referred to the case of Chicago Stoker Corporation, 14 T.C. 441, 443, where the buyer was purchasing a stoker business on a royalty contract. The agreement contained the provision "when the total of the royalties paid by the buyer to the seller of all types of stokers amounts to $70,000.00 no further royalties are to be paid by the buyer under this agreement, and the title to the business and property described. * * shall vest in the buyer." The taxpayer made a final payment of $40,000.00 at the end of approximately 3½ years in order to sell the business to another corporation. The Tax Court in this case departed from the provision of the Uniform Conditional Sales Act which clearly required the purchaser to pay an amount equivalent to the purchase price in order to hold a lease a conditional sales contract. The contract expressly provided the royalty payments were to apply on the purchase price of $70,000.00 and the taxpayer was taking title to the business. The instrument in the instant case is obviously distinguishable.

In its opinion the Tax Court stated:

"From the evidence of record, it is, in our opinion, clear that petitioner through the payments made under the agreement was in fact acquiring and building up an equity in the instant property and that such was the thought or intent of the parties, and we have so found as a fact."

It is difficult to determine from the opinion upon what evidence the tax court relied to reach this finding of fact. The court examined the lease and concluded on an economic analysis as it did in Benton v. C. I. R., 5 Cir., 197 F.2d 745, that the rent paid was to apply on the purchase price or capital investment, and was not for the use and possession of the premises. On the face of the contract the rent for the entire premises was to be $1,666.66 per month for the taxpayer, plus the payment of an amount sufficient for taxes and insurance, reduced by the amount of rent to be paid by Gunnison. To cover taxes and insurance the taxpayer actually paid $440.00 per month. The minimum rent to be paid by Gunnison to the taxpayer was $500.00 per month, and any additional amount up to $3,035.00 as provided by the sublease. In view of the rentals to be paid by Gunnison as provided by the sublease, the taxpayer was not increasing its rent of $700.00 per month on 30% of the premises sufficiently to conclude that the economic test established the payments under the contract for the entire premises were more than a fair rental.

The Tax Court in applying the economic test erroneously considered the contract in retrospect to reach the conclusion that it was the intent of the parties that the rent would apply upon the purchase price. Benton v. C. I. R., supra. The fact that the option was exercised is not indicative of the intention of the parties. It was immaterial that the property proved to be a bargain to the taxpayer. The R. F. C. probably would not have sold the property for $50,000.00 in 1943 but a large decline in the value could reasonably be ex-

pected by 1948. The plant was not modern and the equipment was old. However, the Benton case held that the economic test in itself is only one of the factors to be considered to determine the intention of the parties.

The evidence relating to the time of the execution of the contract refutes the conclusion that it was the intention of the parties that the taxpayer by its payments under the agreement was acquiring or building up an equity. The taxpayer rented the whole of the premises instead of 30% as it formerly did for $700.00 per month. The R. F. C. had calculated and suggested to the taxpayer that Gunnison had prospects of large government contracts and its rent under the sublease would be more than the $700.00 per month which it had been paying. Gunnison itself had proposed to the R. F. C. a yearly lease of the entire premises with a minimum of $500.00 per month, and a maximum of $3,312.50. There was evidence in the record which the Tax Court noted in its opinion and discarded that the fair gross rental value of the entire premises was $45,000.00 per year. The property was valuable to the taxpayer since it was occupying the premises as a going business and was threatened by a possible lease of the entire property to Gunnison. The taxpayer could reasonably anticipate a considerable reduction of its rent by Gunnison's sublease. The R. F. C. had been endeavoring to sell the property by "every means conceivable" without success. The taxpayer in a 1941 letter to the R. F. C. had offered to buy its portion of the premises on a contract for deed for $100,000.00 with a down payment of $6,000.00 and later suggested a lease with the rent to apply on the purchase price. The intention of the parties cannot be determined unilaterally. The R. F. C. evidently did not agree with the taxpayer as to the terms of the contract and consummated the transaction in the form of a lease drawn by the R. F. C. with a sublease to Gunnison. The R. F. C. was not an eleemosynary institution and was not in collusion with the tax-

payer to evade the income tax. It was attempting to protect itself in the transaction by a lease. In case of default in rent it would be easier to regain possession from a tenant than to foreclose or forfeit a contract to purchase and dispossess the purchaser. The taxpayer could exercise the option or not, but in the meantime the payments were neither to be applied on the purchase price, nor were the monthly payments to be made by the taxpayer more than the reasonable rental value.

"If the parties in good faith actually intended to enter into a lease contract, then the taxpayer, up until the time that he exercised his option to purchase, acquired no title to or equity in the property." Benton v. C. I. R., 5 Cir., 197 F.2d 745, 752.

It is not a reasonable inference to conclude that it was the intention of the parties to create an equity by the payments under the contract.

Counsel for respondent argues that the taxpayer hoped to buy the premises as testified to by one of its officers, and from this draws the inference that the rental payments were intended to exceed the use value of the property. Manifestly, one who takes an option does so with the hope of exercising it, but the hope does not create an equity. Counsel for respondent also calls attention to the fact that the taxpayer purchased United States Securities during and after December 1944, in the amount of $125,000.00 to indicate an intention of the parties that the option would be exercised. This was irrelevant to prove the intention of the parties. This might be proof that the taxpayer's financial condition had improved, but until the option was actually exercised the R. F. C. was not permitting the taxpayer to have any equity.

In its opinion the Tax Court concluded from the provisions of the agreement disposing of the insurance proceeds in case of loss of the property by fire, flood or other casualty that the monthly payments were intended to build up an

equity in the property for the taxpayer. There was $325,000.00 insurance in the name of the R. F. C. and the taxpayer carried on the premises at the cost of the taxpayer. The R. F. C. kept the policies. The lease provided that the R. F. C. was privileged to retain from the insurance proceeds the rent remaining due under the lease, plus the option purchase price. The taxpayer carried a larger amount of insurance than was required under the lease. The interruption of the business of the taxpayer would have been disastrous. It was but common sense or business sagacity for a manufacturer to protect itself by insurance on the property which it occupied. The Tax Court evidently ignored the fact that the taxpayer had only an insurable interest in the leased premises. "It is well settled that any person has an insurable interest in property, by the existence of which he will gain an advantage, or by the destruction of which he will suffer a loss, whether he has or has not any title in, or lien upon, or possession of the property itself." Harrison v. Fortlage, 161 U.S. 57, 65, 16 S.Ct. 488, 490, 40 L.Ed. 616; Home Ins. Co. of New York v. Mendenhall, 164 Ill. 458, 464, 45 N.E. 1078. An insurable interest is not an equity in the premises. The R. F. C. made these terms to protect the taxpayer in case of a casualty but not to give the taxpayer an equity in the premises. There was no provision that upon such casualty occurring, the R. F. C. would convey the premises to the taxpayer. Furthermore, the R. F. C. by the terms of the lease could have retained the entire proceeds of the insurance and rebuilt. It was clearly erroneous to conclude from the distribution of the proceeds of insurance that it was the intention thereby to give the taxpayer an equity in the premises.

Counsel for respondent has brought to the attention of the court several cases which are not decisive here. In Oesterreich v. C. I. R., 9 Cir., 226 F.2d 798, there was a contract for rent payments for a period of 67 years and eight months and only a nominal sum of $10.00

was to be paid for the deed, if the option was exercised. In Watson v. C. I. R., 9 Cir., 62 F.2d 35, there was a studied effort to avoid the ruling of the California Railroad Commission in the sale of a motor bus line. A bus was conveyed as each monthly payment was received. In Jefferson Gas Coal Co. v. C. I. R., 3 Cir., 52 F.2d 120, there was a lease of a coal mine and the taxpayer was paying royalties on the coal mined. Again the final payment for obtaining a deed to the land was very small. In Rotorite Corporation v. C. I. R., 7 Cir., 117 F.2d 245, the purchaser was given credit for the royalty payments on the purchase price expressly by the contract. In the instant case there was no provision that the monthly payments would apply on the purchase price and at the time the option was exercised there was still a substantial amount to be paid to obtain a deed to the premises.

The Statute itself, Section 23(a) (1) (A) in plain words provides deductions from gross income for

"rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity."

The very language of the Statute establishes that it is not applicable to the facts or the evidence in this case. There was no equity until the option was exercised. See Helvering v. San Joaquin Fruit & Investment Co., 297 U.S. 496, 56 S.Ct. 569, 80 L.Ed. 824. The monthly payments were a condition "to the continued use or possession of the property for the purposes of the trade or business," and the payments were for the rental value. The contract in the instant case was neither a lease which in substance was a conditional sales contract, nor a contract by which the purchaser was taking title to the property. The Tax Court's conclusion that it was the intention of the parties by the payments that taxpayer was acquiring or

building up an equity in the property was clearly erroneous. The rental deductions should have been allowed.

The decision of the Tax Court is Reversed.