KEARNEY & TRECKER CORPORATION, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 59-C-201.

United States District Court E. D. Wisconsin.

May 9, 1961.

ly and in their briefs, and is prepared to render its decision.

The plaintiff is a manufacturer of milling machines and other machine tools used generally by the metalworking industry. The list price of the various machines involved in the transactions referred to us reveals that they are matters of some substance varying as they do from a low of approximately $5,000 to a high of approximately $63,000 with a probable average of $20,000. For many years prior to 1953, its entire production of machine tools, except for a small portion thereof retained by it for use in its own manufacturing operations, was sold by it either in outright sales or on the installment plan evidenced by conditional sales contracts or by installment notes, secured by chattel mortgages.

However, as early as 1946, the plaintiff began to investigate the advisability of installing a lease program. In making its investigation, it contacted its own customers and manufacturers of machinery who had themselves installed such programs. After making this investigation it determined that a lease program was needful and desirable. This determination was reached after noting that the average price of milling machines had risen from $10,000 to $20,000 between 1940 and 1950, that many customers wanted to try out the machines in their own plants before purchasing, that technological advances gave rise to a desire on the part of customers to avoid the risk of obsolescence, both of the machines and the product for the manufacture of which it was used, by shifting it to the manufacturer, and that many customers needed a specific machine for work of a definite duration or performance of one contract and would have no need for it thereafter. As a result of such studies the plaintiff late in its taxable year 1953 was prepared to and did inaugurate, a tool lease program, permitting its customers to obtain the use of its standard

Lester Clemons, Richard R. Teschner, Dale L. Sorden, Milwaukee, Wis., for plaintiff.

William F. Kolbe, Dept. of Justice, Tax Div., Washington, D. C., Edward G. Minor, U. S. Atty., Milwaukee, Wis., for defendant.

TEHAN, Chief Judge.

The plaintiff, Kearney & Trecker Corporation, a Wisconsin corporation having its principal place of business in the City of West Allis, Milwaukee County, Wisconsin, brings this action pursuant to § 1346, Title 28 U.S.C., to recover corporation income taxes alleged to have been erroneously assessed and collected by the defendant, United States of America, for the fiscal year ending September 30, 1954.[1] After a partial stipulation of facts had been filed, the case was tried to the court, which has now considered the pleadings herein, the facts stipulated, the evidence presented at the trial and the arguments of counsel presented both oral-

---

1. At all times material hereto, the plaintiff kept its books of account and filed its tax returns on an accrual method of accounting and by fiscal years ending on September 30th in each calendar period.

machine tools in their plants under "Tool-Lease Agreements."

By the end of its taxable year 1954, the plaintiff had entered into tool lease agreements with respect to 87 machine tools manufactured by it. In keeping its books and filing its tax return for that year, it treated those agreements as true leases by it of its own machines, declaring as ordinary rental income the payments made to it thereunder by the various lessees, and deducting depreciation on the leased machines. The plaintiff paid the taxes declared as due in that return. Thereafter, the defendant's agents audited the plaintiff's books, records, and tax returns for its fiscal year 1954 and issued a notice of deficiency on August 26, 1958, based on the determination of the Commissioner of Internal Revenue that the plaintiff's tool leases constituted conditional sales for Federal income tax purposes. This determination resulted in the addition to the plaintiff's income of the selling prices of the leased machines, the disallowance of the deduction for depreciation taken by the plaintiff with respect to those machines, the deduction of the cost of those machines as the cost of goods sold, and the elimination from income of rentals received by the plaintiff, except for that portion of the rentals considered by the Commissioner to constitute financing income.[2] The plaintiff paid the additional income taxes assessed pursuant to the notice of deficiency and timely filed its claim for refund which was disallowed.

The sole issue presented to the court in this action is whether the tool lease agreements entered into between the plaintiff and various lessees and in effect in the taxable year here involved were in reality leases, as the plaintiff contends, or conditional sales contracts as contended by the defendant. While certain of the case law including Breece Veneer and Panel Company v. Commissioner of Internal Revenue, 7 Cir., 1956, 232 F.2d

319, on which we hereinafter show our reliance, contains language stating that the character of the transaction is to be determined by, among other things, the intention of both parties, the plaintiff and defendant have agreed that the determination here be made on the basis of the lease program as a whole and not on the basis of a consideration of each of the 87 separate transactions. The proofs were submitted in accordance with that agreement.

The leases which the plaintiff made available to its customers under the lease program adopted in 1953, a program which has remained unchanged from that time to the present, are substantially identical in form. All leases are for a term of seven years. Rents are payable thereunder in semi-annual installments in advance. The lessees assume the obligation of paying all taxes and assessments levied against the leased property and of maintaining casualty insurance on that property in the name of the plaintiff. The lessees also agree to pay the cost of shipment of the leased property, both on delivery and on return to the plaintiff. The leases do not attempt to restrict the lessees in their use of the property, but do require them to exercise due care in the use and servicing thereof and to maintain the property in good condition and repair at their own expense, and give the plaintiff the right to inspect the property, which may not be moved from the locations specified in the leases without the plaintiff's consent.

The leases contain option provisions giving lessees the right to terminate or to purchase[3] at specified times. Three forms of leases, Plan A, Plan B or Plan C, are available, the basic difference between them being the manner in which the options are exercisable. Plan A provides for payment by the lessee of a rental of 25% of the list price of the leased property each year for the first three years of the lease and 10% for each of

---

2. The plaintiff admits that its deferral of rentals paid in advance and applicable to the succeeding tax year was not proper for Federal income tax purposes.

3. Leases were available without options to purchase, but it appears that the great majority had such options.

the remaining four years. Under that plan, the lessee is given an option to return the property at the end of the third year or at the end of each succeeding year, plus an option to purchase the property at the end of the third year for 45% of its list price or at the end of each succeeding year at a rate of 5% of the list price less than the preceding year. The minimum price is 25% of the property's list price, such minimum price being applicable at the end of the seventh year, at which time the lessee would have paid 115% of the list price in rentals.

Under Plan B, the lessee pays a rental of 30% of the list price of the property the first year of the lease, 25% the second year, 20% the third year and 10% each of the remaining four years. The lessee is given an option to terminate exercisable at the end of the second year or at the end of each succeeding year. The option to purchase is also exercisable at the end of the second year, the option price being 60% of the property's list price, and at the end of each succeeding year, the option prices in those years being the same as the option prices under Plan A.

Under Plan C, yearly rentals are 35% of the leased property's list price the first year of the lease, 25% the second year, 15% the third year and 10% yearly thereafter. Options to terminate or purchase are exercisable at the end of the first year or of any year thereafter. At the end of the first year the option price is 80% of the property's list price, and at the end of each succeeding year the option prices are the same as those specified in Plan B.

Under all three plans, the duration of the lease can be extended from year to year, yearly rentals being 10% of the leased property's list price, and option prices after the seventh year remaining at 25% of the list price.

It is the position of the defendant that all leases entered into pursuant to the above described plans were in reality conditional sales contracts because the lessees thereunder were acquiring an equity through their payments of rentals. Whether the rental payments received by the plaintiff under the tool lease agreements in effect during its taxable year 1954 were rental payments or at least in part payments on installment purchases, and whether those agreements were leases or conditional sales contracts is dependent on the intent of the parties to the agreement as ascertained from the terms of the instruments themselves and from the circumstances existing at the time of execution thereof.[4] Western Contracting Corporation v. Commissioner of Internal Revenue, 8 Cir., 1959, 271 F.2d 694.

Our examination of the standard terms of the leases used in connection with all three plans discloses nothing to indicate that the parties intended an installment sale. The standard form contains no provision that rentals are to be applied to the purchase price upon exercise of the option, nor does it provide that title is to pass automatically when the rentals paid equal the original list price plus financing charges. While it does provide that the lessee is to pay taxes, insurance premiums and the cost of repairs, such provisions were not considered significant by the Court of Appeals for this Circuit in the case of Breece Veneer and Panel Company v. Commissioner of Internal Revenue, supra.

It is uncontroverted that the plaintiff at all times has treated the agreements as leases on its books and records. In addition, it places tags on all leased machines identifying them as its property and inspects those machines periodically. Lease agreements, unlike installment sales contracts, are never discounted.

■ Neither do we find anything in the financial provision, inserted in the

---

4. As we stated before, the parties are agreed that the court is to consider the plaintiff's lease program as a whole and not examine each separate transaction. We consider this agreement as a stipulation that the plaintiff's intent plus the terms of the agreement and the surrounding circumstances shown adequately disclose the intent of the various lessees.

standard form of lease when the lessees have chosen whether to lease under Plan A, B or C, or in the surrounding circumstances, which suggests even an inference that the lessees are acquiring an equity in the leased property as they pay rentals. We are satisfied that the option prices were intended to be and were reasonably close approximations of the market value of the machines at the end of any given number of years. We likewise find that the rental charges were intended to and did sufficiently compensate the plaintiff for the average loss in value over the term of the lease attributable to aging, wear and tear, and obsolescence.

■ These findings of reasonableness of both the option prices and the rental are not only affirmatively supported by the credible testimony and documentation, but negatively by the failure on the part of the United States to produce any witness who would state that the option prices were so low, when compared to the market value of the leased property, as to indicate that lessees exercising their options to purchase had previously acquired an equity in that property, or that rental payments were so high when compared with the actual use value of the leased property, as to indicate that they were, in reality, payments on an installment purchase. Under these circumstances we must hold that no equity is being acquired.

The testimony of Mr. Perkins, Treasurer and Assistant Secretary of the plaintiff, whose efforts were largely responsible for the inauguration of the lease program, reveals that the option prices were arrived at in the following manner:

The plaintiff utilized the services of certain of its employees, dealers, and dealers' employees, in formulating its lease program. These persons, representing many years of experience in the machine tool market, determined seven years to be the average useful life of a machine tool.[5] Each of these persons submitted an estimate of the probable market value of a machine tool as of the end of each year of the term of the lease. An average was obtained from these estimates and discussed with those persons, until agreement as to probable market value at the end of each of the seven years and thereafter was obtained. The figures thus arrived at represented the composite judgment of those persons as to a reasonable option price representative of the probable market value.

The option prices established took into consideration the fact that the used machine tool market fluctuated and were fixed on a general long-range average.

The defendant restricted its case on the unreasonableness of the option price to what it could elicit on cross-examination. Such cross-examination did establish that several machines returned to the plaintiff by certain lessees under their option to terminate were sold by the plaintiff for substantially more than the option price, indicating, the defendant contended, that the market value when the option to purchase could have been exercised, was substantially higher than the option price. In our opinion, the plaintiff adequately explained this variance between the option price and its sales price by showing that those machines, when returned, were rebuilt or repaired by it, thereby substantially enhancing their value. In passing it might be observed that the fact that these machines were freely and unconditionally surrendered to the plaintiff by the lessees, suggests that the plant management lessees did not believe they were giving up anything of value.

The defendant has also pointed out that the option prices, when established, were ostensibly based on an "average"

---

5. While Mr. Perkins admitted that a machine would perform to a limited extent for a longer period, and retain a market value of approximately 25% of its original price for a longer period, he explained that it would not normally do the work for which it was purchased, maintain the expected tolerances, or be unaffected by obsolescence for more than seven years.

market, that in 1958 the market in used machine tools was depressed and that in that year 15 lessees exercised options to purchase and only 8 exercised options to terminate. It argues from these facts that if the option prices truly reflected average market values, the majority of lessees in 1958 would have exercised options to terminate and would then have purchased the leased machines from the plaintiff at the price fixed in the depressed market. The fact that the lessees did not follow this procedure, it contends, proves that the option prices were a bargain even in a depressed market and were never intended to reflect average market values. We have been furnished with the bare facts that in a certain limited period, 15 lessees exercised their options to purchase while eight plant management officials surrendered their machines. The motivations that would lead to these decisions could be manifold. In the absence of basic facts we can give this contention by the defendant no weight.

The evidence discloses also that in the years 1955 through 1958, 64 lessees exercised options granted to them under their leases. Of these lessees, 28, or 44%, chose to terminate the lease and return the leased property to the plaintiff, and 36, or 56%, exercised their options to purchase. While it is true that the fact that these options were exercised is not indicative of the intent of the parties when the lease agreements were entered into (Breece Veneer and Panel Company v. Commissioner of Internal Revenue, supra), the fact that only slightly more lessees exercised options to purchase than exercised options to terminate indicates to us that the option prices were not out of line with market values.

The plaintiff established that the rental payments under the lease program were set up in the following manner:

After establishing the option prices, representing in their opinion the market value of the leased property upon exercise of either option, the persons formulating the plaintiff's lease program attempted to arrive at rental figures which would cover its average cost to rebuild, insure, store and resell machines returned to it, plus depreciation and possible obsolescence, so that it could dispose of returned machines on the market without losing money because of having leased those machines. Rents were not dependent on the amount of use given the machine by the lessee, there being no practical way to measure the use of a milling machine. Rentals were fixed at a higher rate during the early years of the lease because the depreciation on the leased machines was higher in those years. Leases negotiated without options to purchase called for rental payments identical to leases containing such options.

In Mr. Perkins' opinion, the rentals called for in the plaintiff's lease program were fair, and we are in agreement.

As we stated before, the defendant called no witness to testify that the rentals exceeded a fair rental. It has argued, however, that the rentals are excessive, and the lessees are therefore acquiring an equity, because (1) the rentals were not related to use, and, (2) the rentals, over a relatively short time (3 years) equal a substantial portion (75%) of the machine's list price.

We do not believe that the fact that the rentals are unrelated to the lessee's use of the machine indicates in this case that rentals are excessive, or that the lessee is acquiring an equity. Mr. Perkins' testimony that there is no practical way to measure use is uncontradicted.

Neither do we believe that the fact that rentals over three years equal 75% of the list price of the machine is indicative of the existence of an installment sale. No lessee is required to choose Plan A, under which the machine must be kept three years. He could choose Plan B, and return the machine in two years after paying rentals equalling 55% of the list price, or Plan C, and return the machine in one year after paying 35% of the list price. Also, the mere fact that rentals are high does not indicate that a portion thereof is in reality a payment on an installment sale, particularly when there is no evidence to show that such rentals, though high, are unreasonable,

and there is positive credible evidence that they are fair.

In the instant case, the lessees were not bound to pay rent substantially equal to the value of the leased property. Under no plan were they bound to pay rentals exceeding 75% of that value. Nor was it certain that the lessees would exercise their options to purchase, and indeed, a substantial number of lessees have chosen not to exercise those options. The rentals paid were not unreasonably high, nor were the option prices unreasonably low. We must therefore conclude that the tool lease agreements entered into between the plaintiff and various lessees and in effect in 1954 were in fact what they purported to be, true leases, and were not installment sales.

It is our opinion that the instant case is governed by the holding of the Court of Appeals for this Circuit in the Breece case, supra, and that the facts herein are comparable in all material respects with those of that case.

The property leased in the Breece case, being land, buildings, machinery and equipment, had been offered for sale by the lessor for $175,000 approximately one year before the lease was negotiated. Under the lease, the lessee was bound to pay a total rent of $100,000 in five years, after which it had an option to purchase the leased property for $50,000. The lease was renewable for three years, the option price at the end of the eighth and final year being $25,000. The Court of Appeals noted that the amount of rent after five years lacked the substantial sum of $50,000 to make the lessee the owner, and held that the lessee was neither bound to pay rent substantially equal to the value of the property nor was it sure to become the owner. In the case before us, no lessees can be bound to pay rent in excess of 75% of the list price of the leased property and lessees are free to choose plans under which the only rentals they are bound to pay are 55% of that price (Plan B) or 35% of that price (Plan A). Option prices available to lessees never drop below 25% of the list price, that price being available at the end of the seventh year of the lease and of any year thereafter. Based on an average list price of $20,000 for the plaintiff's machines, the lessees must pay after seven years $5,000 to become the owners, and higher option prices in the earlier years of the leases result in an even more substantial sum being necessary before ownership of the leased property is transferred. These option prices must be considered substantial under the holding of the Breece case particularly when it is realized that machinery leased by the plaintiff depreciates at a faster rate than much of the property leased in the Breece case.

The lease agreements here involved, like that under consideration in the Breece case, contain no provision granting lessees an equity prior to exercise by them of an option to purchase. Just as in the Breece case the monthly payments were found to be reasonable rental value, the rental payments in this case, being based on a percentage of list price, must be held to be reasonable, there being ample credible testimony in the record to that effect and no evidence to the contrary. So too, as the Court held in the Breece case that the option price was not unreasonable when established, it appears that the option prices fixed by the plaintiff are reasonable and represent average market value.

Counsel for the plaintiff, after reaching agreement with counsel for the defendant with regard to the correct amount of depreciation with respect to leased machines which the plaintiff is entitled to take on its tax return for the year 1954, will prepare findings of fact and conclusions of law, and an order for judgment in accordance with this opinion, and submit them to opposing counsel for approval as to form.