ARKANSAS BANK AND TRUST COM-
PANY, Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. 896.

United States District Court
W. D. Arkansas,
Hot Springs Division.

Dec. 5, 1963.

Smith, Williams, Friday & Bowen,
Little Rock, Ark., Wood, Chesnutt &
Smith, Hot Springs, Ark., for plaintiff.

Robert L. Waters, Dept. of Justice,
Stanley F. Krysa, Dept. of Justice, Fort
Worth, Tex., for defendant.

JOHN E. MILLER, Chief Judge.

This is an action by plaintiff-taxpayer, Arkansas Bank and Trust Company, to recover $960.66 paid under protest to the United States on January 4, 1962. In the plaintiff-taxpayer's 1959 corporate tax return it showed a net operating loss and applied for a tentative carry-back adjustment to the year 1956. The agents of the Commissioner of Internal Revenue examined the 1959 income tax return and application based upon the net operating loss deduction there reflected, and reduced the net operating loss reduction by

disallowing $5,000 "rental expense" claimed by the taxpayer for the year 1959. This adjustment was accompanied by the increase in the allowed interest expense of $1,342.78 and a reduction of interest income of $455.03. The net adjustment had the effect of decreasing the 1959 loss by $3,202.19, which then caused a deficiency of $960.66 for the year 1956, to which the 1959 operating loss had been carried. The taxpayer paid the deficiency and timely filed its claim for refund which was denied.

The pertinent allegations in the plaintiff's complaint are set forth in paragraphs 3 through 7, as follows:

"3. In the corporate income tax return filed for 1959, plaintiff reflected as a deduction rental payments totaling Five Thousand Dollars ($5,000.00) paid pursuant to the terms of a lease under which it rented the building it occupied at Malvern Avenue and Broadway, Hot Springs, Arkansas. A net operating loss was reflected on the return. Pursuant to appropriate provisions of the Internal Revenue Code, this net operating loss was carried back to the year 1956 and a refund of taxes paid in that year was applied for. Agents of the defendant examined the 1959 income tax return and application, as aforesaid, based upon the net operating loss deduction there reflected and, among other changes, reduced the net operating loss deduction by disallowance of the aforesaid rental expense claimed by plaintiff.

"4. Agents of the defendant assessed additional income tax for the year 1956 in the amount of Nine Hundred Sixty and 66/100 Dollars ($960.66), which amount together with interest of Two Hundred Seventy-Six Dollars ($276.00) was paid to the District Director of Internal Revenue on January 2, 1962.

"5. On May 3, 1962, a claim for refund on Treasury Form 843 for the additional taxes assessed and paid, as aforesaid, was duly filed with agents of the defendant by the plaintiff. True copy of the said claim for refund is annexed hereto and incorporated herein by this reference.

"6. Over six (6) months have expired since the aforesaid claim for refund was filed with the defendant and no part of the additional taxes paid for 1956 has been refunded.

"7. The defendant illegally and erroneously determined and assessed the additional income tax liability asserted for 1956 against the plaintiff; illegally and erroneously collected the Nine Hundred Sixty and 66/100 Dollars ($960.66) together with interest thereon paid January 2, 1962, by the plaintiff for that year and illegally and erroneously disallowed the Five Thousand Dollars ($5,000.00) rental payment as provided by the lease agreement of the plaintiff, as aforesaid."

The defendant, United States, in its answer denied the Commissioner's determinations were erroneous, but otherwise admitted the allegations contained in plaintiff's complaint.

On October 23, 1963, the case was tried to the court at which time both parties introduced oral and documentary evidence. At the conclusion of the trial the case was submitted and taken under advisement by the court, subject to the submission of briefs by the parties in support of their contentions, which briefs have been received, and the cause is ready for disposition.

The pertinent facts as developed by the testimony at the trial and as admitted in the pleadings are not in dispute. The inferences to be drawn from them pose the major difficulty in the determination of the parties' contentions.

The President of the Arkansas Bank and Trust Company and principal stockholder is Cecil W. Cupp, formerly of Arkadelphia, Arkansas. In May 1959 Mr. Cupp acquired the stock of Mr. David Burgauer, who was President of Arkansas Trust Company. Mr. Cupp

was President of the Citizens National Bank of Arkadelphia at the time he purchased the stock of Arkansas Trust Company. The Arkansas Trust Company in May 1959 had a capital structure of $400,000 and was located on Central Avenue in Hot Springs, Arkansas. The plaintiff, Arkansas Bank and Trust Company, is the successor of the Arkansas Trust Company. Its principal place of business is in Hot Springs, Arkansas, at the intersection of Malvern Avenue and Benton Street.

This property, owned in 1956 by Mrs. Afton Wootton and her son, Richard Wootton, is a tract of land containing 29,835 square feet, bounded by Malvern Avenue, Benton Street and Broadway. In March 1956 James W. Dowds, Sidney Nutt, and Q. Byron Hurst purchased the property from the Woottons for $125,000. At the time of the sale from the Woottons to Dowds, et al., Ray Smith, Sr., appraised the property for the Woottons at a value of $40,000 for the land and $85,000 for the improvements.

Dowds, et al., operated the property as a partnership under the name of "Broadway Square Building." On the partnership's 1956 tax return, the cost of the property was listed as $25,000 for the land and $100,000 for the improvements.

The improvements on the property at the time of the sale from the Woottons to Dowds, et al., consisted of the following:

(a) The Frederick Hotel building, which fronted the intersection of Malvern Avenue and Broadway Street, a two-story brick structure, with a full basement.

(b) A one-story brick garage and service station facing Broadway, which contained a partial basement.

(c) A one-story brick furniture store with a full basement, facing Malvern Avenue.

(d) A one-story brick building with a full basement facing Malvern Avenue, which contained the Salvation Army, The Sail Bar, a barber shop, and a cab stand.

After the purchase of the property by Dowds, et al., certain capital improvements and repairs were made. In 1957 a capital improvement of $10,000 was made in the Frederick Hotel to construct office space on the second floor. In 1956 repairs were made costing $1,331.62; in 1957 additional repairs were made costing $1,448.22; and in 1958 repairs were made costing $1,634.99. The "Broadway Square Building" partnership of Dowds, Nutt and Hurst received the following rents:

|      | Gross        | Net          |
|------|--------------|--------------|
| 1956 | $9,755.00    | ( $2,058.87) |
| 1957 | 11,225.73    | ( 4,554.63)  |
| 1958 | 13,371.36    | ( 2,729.15)  |
| 1959 | 14,493.61    | ( 750.98)    |

On the 1959 partnership tax return of "Broadway Square Building" amounts received under the "lease" were reported as rent.

In May 1959 Dowds, on behalf of the partnership, offered to sell this property to Cecil W. Cupp, President of the Arkansas Bank and Trust Company for $150,000. Cupp advised Dowds that the bank could not purchase the property because of state and federal bank regulations, but that the bank might lease the property if approval of the federal banking authorities and the Comptroller of the Currency could be obtained. The property was in a submarginal area outside the established trade avenues of the City of Hot Springs. One block east of the property was the Rock Island depot and west and south of the property the Missouri Pacific depot.

Mr. Cupp, as President of the Arkansas Bank and Trust Company, had a difficult time obtaining authority from the Board of Directors to negotiate with Dowds for a lease of the property.

The "Agreement of Lease," which was negotiated at arms length, was executed by "Broadway Square Building" and "Arkansas Trust Company" on September 15, 1959. It contained the following major provisions:

"The Lessors [Dowds, Hurst, and their wives] have this day leased to

the Lessee [Arkansas Trust Company] the following described lands located in the City of Hot Springs, Garland County, Arkansas, to-wit:

[description omitted]

for a term of Fifteen (15) years, beginning on the 15th day of September, 1959, and ending on the 14th day of September, 1974. The Lessee agrees to pay, and the Lessors agree to accept as rent for said premises during said term the sum of One Thousand Two Hundred Fifty ($1,250.00) Dollars per month, payable in advance on the 15th day of each month through and including the 15th day of August, 1962, and the sum of Nine Hundred ($900.00) Dollars per month, payable in advance on the 15th day of each month beginning the 15th day of September, 1962, through and including the 15th day of August, 1974.

"The Lessee further agrees that, during the terms of this lease, it will pay all property and ad valorem taxes and special assessments levied against the leased premises and on any building the Lessee may elect to construct on said leased premises, and that it will pay all insurance on the buildings on said leased premises or any replacement thereof, and all costs of operation, maintenance and repair of the buildings or any replacement thereof, and all utility charges, including, but not limited to, water, gas, lights, sewer service, telephone and garbage disposal.

"COVENANTS OF THE LESSEE:

"(1) The Lessee does hereby covenant and agree with the Lessors that it will:

"(A) Pay said rent at the times and place and in manner aforesaid:

"(B) Use and occupy said premises in a careful and proper manner.

"(C) Not use or occupy said premises for any unlawful purposes; and will conform to and obey all present and future laws, and ordinances, and all rules, regulations, requirements and orders of all governmental authorities or agencies, respecting the use and occupation of the demised premises.

"(D) Indemnify and save harmless the Lessors from and against any loss, damage and liability occasioned by, growing out of, or arising or resulting from the Lessee's occupation of the said premises, or from any tortious or negligent act on the part of the Lessee, its agents or employees.

"(E) The Lessee agrees to maintain buildings on the leased premises, or any replacement thereof, in the same condition that they now are, or in the condition that they may be placed by the Lessee during the term of this lease, ordinary wear and tear excepted, and the Lessee further agrees that upon the termination of this lease and in the event that the option to extend this lease contained in paragraph (4) hereof is not exercised, or upon the termination of the extended period of this lease, and if the option to purchase contained in paragraph 5 hereof is not exercised by the Lessee, the leased premises and the buildings thereon will revert to the Lessors, free and clear of any claim of the Lessee.

"COVENANTS OF THE LESSORS:

"(2) The Lessors, on their part, covenant and agree with the Lessee:

"(A) That the Lessors have good and merchantable title to the leased premises, free and clear of all liens and encumbrances, except the lien of a certain Deed of Trust from Sidney M. Nutt, James J. Dowds and Q. Byrum Hurst to Cooper B. Land, Trustee for Afton W. Wootton and Richard Hartley Wootton, dated the 12th day of

March, 1956, and recorded in Book 417 at pages 370–372 of the Records of Garland County, Arkansas, and also except the lien of a certain Deed of Trust from Q. Byrum Hurst and James J. Dowds to Norton Meek as Trustee for Arkansas Trust Company, dated the 15th day of September, 1959.

"(B) If the Lessee shall pay the rent as herein provided and shall keep, observe and perform all of the other covenants of this lease by it to be kept, performed and observed, the Lessee shall and may peaceably and quietly have, hold and enjoy the said premises for the term aforesaid.

"(C) The Lessors agree that any purchaser, assignee, mortgagee, or pledgee of the Lessors' interest in the leased premises, or the Lessors' interest in this lease, shall be bound by the terms of this lease and the options contained herein, and that this lease and the options contained herein, and the deed held in escrow under the Escrow Agreement hereinafter mentioned, shall constitute the first and prior claim against the leased premises, subject only to the Lessors' prior deed of trust to Cooper B. Land, Trustee for Afton W. Wootton and Richard Hartley Wootton, and Lessors' deed of Trust to Norton Meek, Trustee for Arkansas Trust Company, dated September 15, 1959.

"MUTUAL COVENANTS:

"(3) (A) If the Lessee shall, at any time, be in default in the payment of the rent herein reserved, or in the performance of any of the covenants, terms and conditions or provisions of this lease, and the Lessee shall fail to remedy such default within thirty (30) days after written notice thereof from the Lessors, the Lessors may, at their option, elect to cancel this lease and retake possession of the premises.

"(B) The Lessors hereby grant to the Lessee the right to demolish all buildings and other structures now located on the leased premises, at the expense of the Lessee, and in the event that the Lessee elects to demolish said buildings, the Lessee agrees that it will construct upon the leased premises a building for banking and other purposes, the materials, design, and costs of said building to be determined at the sole discretion of the Lessee, provided that said building to be erected by Lessee shall be at least equivalent in value to the existing buildings on said leased premises.

"(C) The Lessors shall give written notice to all tenants now in possession of any of the leased premises to quit and deliver said premises to the Lessee on or before the 15th day of March, 1960, and the Lessors covenant that all said tenants will deliver possession to the lessee on or before said date.

"(D) The Lessors agree that the Lessee shall be entitled to receive all rents coming due from tenants now in possession of any part of the said premises from and after the date of this Lease, and the Lessors agree to pay to the Lessee all unearned rentals collected in advance by the Lessors as of the date of this Lease.

"(E) The Lessors agree to pay to the Lessee the earned portion of 1959 property and ad valorem taxes prorated as of the date of this lease.

"OPTIONS:

"(4) The Lessee, upon the termination of this lease, shall have the right, at its option, to extend this lease for an additional period of fifteen (15) years beginning the 15th day of September, 1974, and expiring the 14th day of September, 1989, upon the same terms and conditions as herein set out, except that the

monthly rental for such extended period shall be $350.00 a month, payable in advance on the 15th day of each month during the term of said extension, provided that the Lessee shall give written notice of its intention to exercise said option to extend the lease at least 30 days before the termination of the original term of this lease.

"(5) In the event that the Lessee shall exercise its option to extend this lease for an additional period of fifteen (15) years as set out in paragraph (4) above, the Lessee shall have the further option, at any time during the term of said fifteen year extension of this lease, to purchase the leased premises from the Lessors for the sum of Thirty-five Thousand ($35,000.00) Dollars, provided that the Lessee shall give thirty days notice of its intention to exercise its said option to purchase in writing. In the event that the Lessee shall exercise its option to purchase, the said leased premises during the term of said fifteen year extension of the said lease, the Lessors agree, upon payment of the said purchase price, to deliver to the Lessee a Warranty Deed with Federal Revenue Stamps attached, conveying the leased premises to the Lessee absolutely and in fee simple, free and clear of all encumbrances.

"(6) The Lessors have deposited with Citizens National Bank of Arkadelphia, of Arkadelphia, Arkansas, in escrow, a warranty deed conveying the said leased premises to the Lessee, and Federal Documentary Stamps in the sum of $38.50. The terms of the Escrow Agreement with the said Escrow Agent provide that in the event the Lessee exercises the option to extend this lease, contained in Paragraph (4) above, and in the further event that the Lessee, at any time of the term of the extension of said lease, exercises its option to purchase the said property, the Escrow Agent shall deliver to the Lessee the said Warranty Deed with Documentary Stamps attached, upon payment to the Escrow Agent of the sum of $35,000.00 for the account of the Lessors. In the event that the Lessee does not exercise its option to extend the original term of this lease, or in the event that the Lessee does not exercise its option to purchase the leased premises during the extended term of this lease, the said Warranty Deed and Documentary Stamps shall be returned to the Lessors."

The taxpayer plaintiff was given possession of the property as of the date of the "Agreement of Lease", September 15, 1959, and the tenants vacated the premises on or before the spring of 1960. Improvements on the property were removed, and the taxpayer's banking facility was erected at a cost of approximately $750,000. The taxpayer first occupied the new banking facility during November 1961 and continuously thereafter. The federal regulatory bank agencies required the taxpayer to charge off the cost of the construction of the banking facility on the bank's books at the rate of $50,000 per year, and beginning with the year 1961 the cost of the erection of the bank building would be reduced on the books of the bank to $150,000 over the next 12 years.

Both the plaintiff and the defendant introduced evidence as to the value of comparable property in the immediate area. On behalf of the plaintiff, Mr. Ray Smith testified as to an appraisal made November 1, 1956, by Smith, Frank Housley, and Joe M. Lyon. Messrs. Housley and Lyon were deceased at the time of the trial. They made an appraisal for estate tax purposes of the Peoples Laundry building located on Lots 11, 12 and part of 13, Block 67, Hot Springs Reservation, which is south of the same block upon which the "Broadway Square Building" property is located. The appraisal testified to by Smith reflected the best judgment of the appraisers at the time it was made in 1956 after a careful examination of the exist-

ing premises. It reflected a value of $10,000 for the land and $20,000 for the building. This block, which contained 12,970 square feet of land, was valued at approximately 77¢ per square foot. The valuation thus established by Smith's appraisal was used in the estate tax return of the Mose Klyman Estate, and was audited and accepted by the Internal Revenue Service. In June 1957 this property was sold to H. A. Wheatley for $35,000, which was the amount it had been appraised for by Smith, et al.

There was also included in the Klyman Estate two tracts of property directly across Malvern Avenue from the "Broadway Square Building" property. One tract, comprised of Lot 5 and part of Lot 14, contained 12,815 square feet; the other tract, comprised of Lots 6, 7 and 8, contained 13,120 square feet. These lots were reported in the estate tax return at a value of $15,000 for the land and $20,000 for improvements. These properties were reflected in Klyman's wife's estate, who died August 7, 1957, at the same value that they were reported in her husband's estate tax return. The land in these two tracts were valued at approximately 62.6¢ per square foot. The sole heir of Mrs. Klyman, Billie Leonard Reinagle, sold these two lots and improvements on August 7, 1959. for $50,000.

Thomas Dobson, Hot Springs realtor and a well qualified appraiser, whose office is one block north of the "Broadway Square Building's" property, testified that he knew these properties well, and was of the opinion that the $35,000 value assigned to the land was realistic. He stated that he had studied the "Agreement of Lease," and was of the opinion that the rental set forth in it by the plaintiff-taxpayer and the Broadway Square partnership was reasonable.

On behalf of the defendant, Mr. H. Ward Conde, a real estate dealer and appraiser, testified that in his opinion the improvements on the "Broadway Square Building" property as of September 15, 1959, had a value of $48,562.50, and the land had a value of $70,000.

Mr. Cupp's testimony that the intent of the bank, when he represented it in the negotiations with Dowds, was to lease the property in question was corroborated by Dowds, Hurst and Norton Meek, who is an Executive Vice President and Secretary of the Arkansas Bank and Trust Company.

The plaintiff-taxpayer contends that a deduction for payments made under the "Agreement of Lease" should be allowed as "rentals" under Sec. 162(a) (3) of the Internal Revenue Code of 1954, 26 U.S.C. § 162(a) (3).

The defendant, United States, contends that to allow a deduction for rental under Sec. 162(a), the taxpayer must not be acquiring an equity in the property, taking title to the property, or have taken title to the property.

Sec. 162(a) (3) provides that "rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity" may be deducted as an ordinary and necessary business expense.

The plaintiff-taxpayer, to be allowed a deduction for the "rental" payments under the "Agreement of Lease," must not have taken title to or acquired an equity in the "leased" property.

Chief Judge Chambers of the Ninth Circuit in Starr's Estate v. Commissioner of Internal Revenue, (9 Cir. 1959) 274 F.2d 294, graphically stated:

"Yesterday's equities in personal property seem to have become today's leases. This has been generated not a little by the circumstance that one who leases as a lessee usually has less trouble with the federal tax collector. At least taxpayers think so."

The critical factor with respect to the "Agreement of Lease" transaction of September 15, 1959, is the motive or intent with which it was consummated. In construing the "Agreement of Lease," the sole question is whether or not the

parties intended the payments to be for the "use" of the land and thus deductible as "rentals," or whether the "rentals" are actually payments by which the plaintiff is taking title to or acquiring an equity in the property.

In determining whether a transaction is a sale or a lease, the mere labeling it a "lease" does not control the legal consequences of the parties' conduct if, in fact, the transaction amounts to a sale. See Starr's Estate v. Commissioner, (9 Cir. 1959) 274 F.2d 294; Frito-Lay, Inc. v. United States, (N.D.Ga.1962) 209 F.Supp. 886. The practical realities or substance of the transaction govern its treatment for tax purposes, Robinson v. Elliott, (9 Cir. 1958) 262 F.2d 383; Oesterreich v. Commissioner, (9 Cir. 1955) 226 F.2d 798.

In Benton v. Commissioner of Internal Revenue, (5 Cir. 1952) 197 F.2d 745, the taxpayer "leased" automobiles for a taxicab business at the rate of $5,000 a month for nine months with an option at the end of the tenth month to purchase the automobiles for $35,000. The Tax Court found the "lease" to be a conditional sales contract, and payments made thereunder thus capital investments and not deductible as business rental expense for income tax purposes. In construing the agreement with respect to the intention of the parties, the Court of Appeals at page 752 of 197 F.2d stated:

"There being here involved no restraint by law or public policy, the parties had full liberty to contract as they pleased. Whether what is in form a lease is in effect a conditional sale contract depends on the intention of the parties. The economic relation of the value of the property to the option price was only one factor to be considered in determining intent. Further that factor must be considered not as of the time for the exercise of the option, but rather in the light of the facts and circumstances as they existed at the time the parties entered into the contract.

\* \* \* \* \* \*

"If the parties in good faith actually intended to enter into a lease contract, then the taxpayer, up until the time that he exercised his option to purchase, acquired no title to or equity in the property. For the Commissioner and the Tax Court to decide solely by the application of an objective economic test that the taxpayer had an equity in the property, effectively begs the question to be decided, namely whether what was in form a lease was in substance and according to the real intention of the parties a conditional sale contract."

See Gem Incorporated v. United States, (N.D.Miss.1961) 192 F.Supp. 841, and Frito-Lay, Inc. v. United States, (N.D. Ga.1962) 209 F.Supp. 886, which construe and apply Benton v. Commissioner, supra.

In Breece Veneer & Panel Co. v. Commissioner of Internal Revenue, (7 Cir. 1956) 232 F.2d 319, the taxpayer "leased" real property with improvements under a "lease agreement," in which the taxpayer was to pay rent monthly in advance to the Reconstruction Finance Corporation in the sum of $20,000 per year for a term of five years, renewable for three additional years. The "lease" also gave the taxpayer an option to purchase the premises, machinery and improvements for $50,000 at the end of the 5th and 6th years; for $37,500 at the end of the 7th year; and $25,000 at the end of the 8th year. Under the contract the taxpayer lessee was to pay all taxes, assessments and insurance, which amounted to approximately $440.00 per month. The Court of Appeals, 7th Circuit, in construing the "lease agreement" made the following statement at page 322 of 232 F.2d with respect to the economic test:

"The Tax Court in applying the economic test erroneously considered the contract in retrospect to reach the conclusion that it was the intent of the parties that the rent would apply upon the purchase price. Benton v. C. I. R., supra. The fact that the option was exercised is not in-

dicative of the intention of the parties. It was immaterial that the property proved to be a bargain to the taxpayer."

As to the effect of an option in a "lease agreement" transaction, which has resulted from arms-length bargaining between the parties, the Court of Appeals stated beginning at page 323 of 232 F.2d:

" * * * The R.F.C. was not an eleemosynary institution and was not in collusion with the taxpayer to evade the income tax. It was attempting to protect itself in the transaction by a lease. * * * The taxpayer could exercise the option or not, but in the meantime the payments were neither to be applied on the purchase price, nor were the monthly payments to be made by the taxpayer more than the reasonable rental value.

"'If the parties in good faith actually intended to enter into a lease contract, then the taxpayer, up until the time that he exercised his option to purchase, acquired no title to or equity in the property.' Benton v. C. I. R., 5 Cir., 197 F.2d 745, 752.

It is not a reasonable inference to conclude that it was the intention of the parties to create an equity by the payments under the contract.

"Counsel for respondent argues that the taxpayer hoped to buy the premises as testified to by one of its officers, and from this draws the inference that the rental payments were intended to exceed the use value of the property. Manifestly, one who takes an option does so with the hope of exercising it, but the hopes does not create an equity.

&ast; &ast; &ast; &ast; &ast; &ast;

"The very language of the Statute establishes that it is not applicable to the facts or the evidence in this case. There was no equity until the option was exercised. See Helvering v. San Joaquin Fruit & Investment Co., 297 U.S. 496, 56 S.Ct.

569, 80 L.Ed. 824. The monthly payments were a condition 'to the continued use or possession of the property for the purposes of the trade or business,' and the payments were for the rental value. The contract in the instant case was neither a lease which in substance was a conditional sales contract, nor a contract by which the purchaser was taking title to the property."

In Kearney & Trecker Corp. v. United States, (E.D.Wis.1961) 195 F.Supp. 158, the taxpayer had "lease agreements" with a manufacturer who delivered machine tools to the taxpayer who was required to make reasonable payments for their use. The "lease" also contained an option to purchase the tools. The taxpayer-lessee sought to deduct the "rental payments" as a business expense. As to the effect of an option in the "lease," the District Court stated at page 164 of 195 F.Supp.:

"The lease agreements here involved, like that under consideration in the Breece case, contain no provision granting lessees an equity prior to exercise by them of an option to purchase. Just as in the Breece case the monthly payments were found to be reasonable rental value, the rental payments in this case, being based on a percentage of list price, must be held to be reasonable, there being ample credible testimony in the record to that effect and no evidence to the contrary. So, too, as the Court held in the Breece case that the option price was not unreasonable when established, it appears that the option prices fixed by the plaintiff are reasonable and represent average market value."

In Western Contracting Corporation v. Commissioner of Internal Revenue, (8 Cir. 1959) 271 F.2d 694, the taxpayer had a "lease agreement" under which it used heavy construction equipment, but the written contract contained no option clause. However, at or near the expiration of the primary lease term in some 75 leases the dealer-lessor offered to sell the lessee each item of equipment cov-

ered by the lease. Payments made under the "lease" arrangement were credited against the purchase price. The taxpayer-lessee sought to deduct "the rental payments" as a business expense for income tax purposes, which the Tax Court would not allow. On the question of establishing the intent of the parties, the Court of Appeals at page 699 of 271 F.2d stated:

"Thus, the underlying and basic issue is—was Western acquiring an equity in the equipment. The ultimate conclusion of the Commissioner and Tax Court is based on the initial premises that the lease agreement, as written, did not represent the real intent of the parties. It is true that, in determining this basic issue, we must look to the intention of the parties and the actual legal effect of the instrument. Oesterreich v. Commissioner of Internal Revenue, supra, 226 F.2d at page 801; Earl L. Lester v. Commissioner, 32 T.C. 60; Benton v. Commissioner, 5 Cir., 197 F.2d 745, 752; D. M. Haggard, 24 T.C. 1124, 1128, affirmed 9 Cir., 241 F.2d 288; Breece Veneer & Panel Co. v. Commissioner of Internal Revenue, 7 Cir., 232 F.2d 319. In D. M. Haggard, supra, 24 T.C. at page 1129, the Tax Court recognized the rule in this language: 'To properly discern the true character of the payment, therefore, it is necessary to ascertain the intention of the parties as evidenced by the written agreements, read in the light of the attending facts and circumstances *existing at the time the agreement was executed.*' (Emphasis supplied.) Stated differently, it is the substance of the transaction, and not its mere form which controls, and the substance is to be determined from the intent of the parties. [Omitting ci-

tations.] This rule is tersely stated in Oesterreich, supra, 226 F.2d at page 801: 'If the parties enter into a transaction which they honestly believe to be a lease but which in actuality has all the elements of a contract of sale, it is a contract of sale and not a lease no matter what they call it nor how they treat it on their books.'

"The foregoing principle apparently has been consistently applied in cases where the payments were made under lease arrangements with options to purchase, thus giving the payments 'chameleon characteristics,' Mertens Law of Federal Income Taxation, Vol. 4, § 25.109. As stated in Chicago Stoker Corporation, 14 T.C. 441, 444, 'Cases like this, where payments at the time they are made have dual potentialities, i. e., they may turn out to be payments of purchase price or rent for the use of the property, have always been difficult to catalogue for income tax purposes.' Thus, where the true nature of payments made under a lease-purchase instrument is drawn into question in tax cases, it is necessary to ascertain what the parties intended."

At page 701, the court, with respect to the so-called "economic test" and its limitation, said:

"In a proper case, the economic factors of the situation may be important in interpreting an agreement, and in arriving at the intent of the parties,[10] but there is no legal basis here for holding, as the tax court in effect did, that such factors and circumstances can make a new agreement for the parties. * * *"

■ The evidence adduced by the plaintiff taxpayer convincingly supports

"10. It is clear that such considerations are material in construing leases containing options inasmuch as payments made thereunder obviously have a dual potential. Not *every* lease containing an option to purchase may be held primarily a sales contract. The decision ultimately depends on the intent of the parties and is governed to a large extent by the particular facts in each case. [Omitting citations.]

its contention that the "Agreement of Lease" was intended to be, and in fact is, a lease. The fact that the "Agreement of Lease" contains an option clause is not of itself determinative of whether the instrument of the agreement is in fact a "sales contract" or a "lease."[1]

Without doubt the "Agreement of Lease" as entered into by the taxpayer and the owners of the property was in all respects a valid lease under the law of Arkansas. Under the facts which existed at that time, as found by the court, it was clearly the intention of the taxpayer and the landowners to do exactly as provided in the lease. The taxpayer has not taken title to the property, is not taking title to the property, nor is it acquiring an equity under the "Agreement of Lease." The taxpayer may or may not exercise its option, but it cannot acquire any title to or equity in the property without first exercising the option to extend the term of the lease.

It will be recalled that paragraph (4) of the lease provides that upon the termination thereof, the lessee, the taxpayer, "shall have the right, at its option, to extend this lease for an additional period of fifteen (15) years beginning the 15th day of September, 1974, and expiring the 14th day of September, 1989, upon the same terms and conditions as herein set out, except that the monthly rental for such extended period shall be $350.00 a month, payable in advance on the 15th day of each month during the term of said extension, provided that the Lessee shall give written notice of its intention to exercise said option to extend the lease at least 30 days before the termination of the original term of this lease."

Paragraph (5) of the "Agreement of Lease" provides: "In the event that the Lessee shall exercise its option to extend this lease for an additional period of fifteen (15) years as set out in paragraph (4) above, the Lessee shall have the further option, at any time during the term of said fifteen year extension of this lease, to purchase the leased premises from the Lessors for the sum of Thirty-five Thousand ($35,000.00) Dollars, provided that the Lessee shall give thirty days notice of its intention to exercise its said option to purchase in writing."

The rental payments required to be made by the terms of the "Agreement of Lease" were reasonable at the date it was entered into. The court must consider the facts as they existed when the "Agreement of Lease" was entered into.

Therefore, the "rental payments" are fully deductible as business expense under Sec. 162(a) (3) of the Internal Revenue Code and regulations thereunder, 26 U.S.C. § 162(a) (3), and the plaintiff, Arkansas Bank and Trust Company, is entitled to recover from the defendant the sum of $960.66, together with interest thereon at the rate of 6 percent per annum from January 4, 1962.

A judgment in accordance with the above is being entered today.

---

1. The court has heretofore discussed the following cases cited in the defendant's brief: Oesterreich v. Commissioner, supra; Western Contracting Corporation v. Commissioner, supra; Starr's Estate v. Commissioner, supra; and in addition the defendant cites in support of its contentions Burroughs Adding Machine Co. v. Bogdon, (8 Cir. 1925) 9 F.2d 54; Haggard v. Commissioner, (9 Cir. 1956) 241 F.2d 288; Beus v. Commissioner, (9 Cir. 1958) 261 F.2d 176; Holeproof Hosiery Co. v. Commissioner, (Board of Tax Appeals, 1928) 11 B.T.A. 547, which the court has examined with care, but in view of the facts in the instant case as found by the court these cases are not controlling nor contrary to the conclusion reached herein.