T. WAYNE DAVIS AND ADELE A. DAVIS, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Davis v. Commissioner
Docket No. 10001-75.
United States Tax Court
T.C. Memo 1978-348; 1978 Tax Ct. Memo LEXIS 170; 37 T.C.M. (CCH) 1441; T.C.M. (RIA) 78348; August 31, 1978, Filed David R. Mason, for the petitioners. Ronald M. Frykberg, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined the following deficiencies in petitioners' income tax: Petitioners
Years
Deficiencies
T. Wayne and Adele A. Davis
1970
$ 1,597.74
1971
14,961.00
1972
12,787.00
Marvin H. and Neysa I.
Klepfer
1971
7,538.00
1972
6,119.00
Lowell L. and Marguerite
R. Thalman
1971
6,595.00
1972
5,745.00
Estate of Mae E. Latta, deceased,
1971
$ 3,877.00
John S. Latta, Jr., Executor,
1972
3,225.00
and John S. Latta, Jr., in-
dividually
J. Robert and Cecile H. Powers
1971
716.63
1972
513.23
Robert L. and Berdena Beach
1971
2,241.00
1972
1,560.00
Allan L. and Loretta M. McEnroe
1971
341.30
1972
325.00
Robert C. and Ruth I. Hill
1971
2,494.08
William E. and JoAnne F. Plantan
1971
320.00
1972
280.00
*172 Due to concessions by petitioners, the issues remaining for decision are: 1. Whether Latta's, Inc., petitioners' subchapter S corporation, is entitled to deduct payments made for the use of equipment; specifically, whether these payments were for the purchase or rental of this equipment; 2. If the first issue is decided for respondent, whether respondent correctly determined, for purposes of depreciation, the useful lives of the equipment deemed to have been purchased by Latta's, Inc.; and 3. Whether petitioners T. Wayne and Adele A. Davis are entitled to rental expense deductions in 1970 through 1972 in connection with their two Florida condominium apartments. FINDINGS OF FACT Some of the facts have been stipulated by the parties and are found accordingly. At the time they filed their petition, petitioners had the following residences: Petitioners
Residence
T. Wayne and Adele A. Davis
Cedar Falls, Iowa
Marvin H. and Neysa I. Klepfer
Cedar Falls, Iowa
Lowell L. and Marguerite R. Thalman
Cedar Falls, Iowa
John S. Latta, Jr., individually
Cherokee Village,
and as executor of the Estate
Arkansas
of Mae E. Latta, deceased
J. Robert and Cecile H. Powers
Waterloo, Iowa
Robert L. and Berdena Beach
Cedar Falls, Iowa
Allan L. and Loretta McEnroe
Cedar Falls, Iowa
Robert C. and Ruth I. Hill
Sun City, Arizona
William E. and JoAnne F. Plantan
Cedar Falls, Iowa
*173 Petitioners Adele A. Davis, Neysa I. Klepfer, Marguerite R. Thalman, Cecile H. Powers, Berdena Beach, Loretta McEnroe, Ruth I. Hill and JoAnne Plantan are parties only by virtue of having filed joint returns with their husbands during the years in question. 1a When we hereafter refer to petitioners, we will be referring to those petitioners who are shareholders of Latta's, Inc. ("Latta's"), a subchapter S corporation. [2]
*174 At its inception in 1948 Latta's was a small college book store in Cedar Falls, Iowa. About three years later Latta's began to expand its business by entering the office supply and equipment sales fields in Cedar Falls and Waterloo, Iowa. Until 1962 all printed forms sold by Latta's were produced by outside printers. Latta's had no printing equipment until it merged in 1962 with Lincoln Press. In the early 1960's there was a rapidly increasing demand for Latta's products. This growth was the result of an accounting system Davis created for small businesses, especially professionals, called "pegboard" accounting. Latta's system was called "Control-O-Fax." In this accounting system an entry is made just once, and then copied on a 3-M Corporation "Thermo-Fax" copier. Latta's was able to convince local 3-M dealers that Control-O-Fax would help them sell copying machines. The program was successful and 3-M dealers began promoting the accounting system along with their copying machines. Latta's was always concerned, however, that 3-M might devise a similar accounting system and attempt to compete with Latta's. Davis' pegboard accounting system forms could not be copyrighted. *175 Competition from 3-M, however, never materialized. Latta's began printing all the components of this accounting system. Among the items printed by Latta's were envelopes, receipts, ledger cards and journal sheets, and Latta's own promotional materials. Latta's quickly realized that the building and equipment obtained from Lincoln Press were insufficient for its needs. [3] Latta's decided to expand its printing facilities. First it needed a new building. Latta's policy for financing growth from its inception to the present was for stockholders to reinvest profits in the company as opposed to looking outside for additional capital. However, to finance a new plant Latta's sought a loan from its local bank, the Waterloo Savings Bank. Latta's had had a close relationship with the Waterloo Savings Bank for many years. The bank's president, Mr. DeKoster, was concerned about Latta's rapid expansion. He believed that Latta's had insufficient capital to keep up with its expanding *176 inventory and working capital needs and to invest in fixed assets. He thought that Latta's rapid expansion was potentially dangerous to Latta's unless working capital was preserved. Accordingly, he refused to loan money to Latta's to finance a new building and limited Latta's line of credit to approximately $ 200,000. He suggested as an alternative that Latta's lease a new building from outside investors. Latta's shareholders rejected that idea. Thereupon, DeKoster suggested that some of Latta's shareholders who had the financial means form a new company to construct a building and lease it to Latta's. Four of Latta's shareholders (Davis, Thalman, Klepfer and Yaggy) decided to follow DeKoster's advice and formed Control-O-Fax Management, Inc. ("Management"). The four were equal shareholders in Management, contributing $ 57,000 to its capital. Management bought 15 acres of land from the City of Waterloo for $ 30,000 and obtained financing for the $ 730,000 building from the Lutheran Mutual Life Insurance Company and the Waterloo Industrial Development Association. The new building, containing 54,000 square feet and located near the Waterloo airport, was leased to Latta's *177 immediately upon its completion. Latta's needed new equipment for its expanded facilities. Again DeKoster was unwilling to lend money to Latta's for fixed assets. Not only did he believe it was unwise for Latta's to invest in fixed assets, but he also thought it would make Latta's balance sheet look sounder if it were "not clouded with debt on fixed assets." In addition, the bank had recently had two had experiences lending to rapidly expanding busbnesses that failed, and it was not eager to risk another such experience. Finally, DeKoster suggested it would be prudent for the four shareholders of Management to have their investments spread between the two companies and not have all their capital solely in Latta's stock. For these reasons he suggested that Latta's lease equipment from Management or another leasing company. From Latta's point of view, leasing equipment (as opposed to buying it) had a major advantage; leasing made Latta's stock easier to value and thereby facilitated the transfer of stock to key employees to whom the company wished to extend stock purchase opportunities. This also simplified the company's stock retirement policy. It had long been Latta's policy *178 to have its stock owned only by active employees of the company. DeKoster's bank was willing to lend money to Management to purchase equipment to lease to Latta's provided the loans were secured by the equipment and the leases were assigned to the bank. Management's shareholders were not required to guarantee the loans. Latta's inquired of numerous leasing companies about the feasibility of leasing equipment from them. Although Latta's eventually decided to lease its equipment from Management, its inquiries made it aware of the manner and cost of leasing equipment. Management's leases were patterned on the customary leases generally available in the trade. Management dealt at arm's length with Latta's to protect Latta's minority shareholders who were not also shareholders of Management. All of Management's leases with Latta's were similar.Each provided a 36-month term, whether the estimated useful life of the equipment was 3, 4, 5, 6, 7, 8 or 10 years. 3a The rental rate for the 36-month term was competitive with rates being offered by independent leasing companies. The leases were renewable indefinitely on an annual basis at 1/12 the annual rate of the initial 3-year *179 term. This reduced renewal rental rate was also comparable to the rates being offered by independent leasing companies. None of the leases contained an option to purchase. From 1965 through 1972, Latta's entered into 136 equipment leases with Management. Management chose a 36-month term for its leases for several reasons: (1) Management desired to recover its investment quickly in view of Latta's exposure to competition from 3-M; (2) Latta's used the equipment for several shifts a day at a faster operating pace than that recommended by the manufacturer, thereby wearing out the equipment faster than normal use; (3) Latta's preferred a short-term lease because the equipment was subject to rapid obsolescence; and (4) Management believed the 36-month term and the initial and renewal rental rates were the same as would have been offered by an independent leasing company. The leases were intended by both parties to be valid, binding leases, not sales contracts, and the rents *180 were intended to be arm's length reasonable rents, not installment sales payments. Each lease stated the cost of the equipment (including transportation and installation), "interest," and total cost of the lease to Latta's for the 3-year term. "Interest" was a term drawn "out of the air" and merely intended to show Management's profit on the lease. The leases provided for prepayment of the first and final months' rent, that title to the property remained exclusively in the lessor, and that damages for any loss or injury to equipment were payable based on the market value of the equipment irrespective of the rents paid or accrued. The leases were treated as leases for all purposes on the books and records of both Latta's and Management. In 94 out of the 136 leases all or some of the equipment covered by the leases is still being used by Latta's either as primary equipment or as standby or backup equipment. Other equipment has been sold to third parties or traded-in on new equipment. When property is traded-in, it is treated as a sale of the old property by Management. The new lease for the new equipment is based on the full purchase price without credit for the trade-in. Management *181 gets the entire benefit of the residual value of used equipment it sells. In a few cases, Latta's has purchased the leased equipment from Management. Several leases covered cameras and related equipment. The cameras and related equipment were used in a new accounting method developed by Latta's. When this program ran into difficulty, Latta's purchased the cameras from Management because it found it could keep better track of the cameras (which had been loaned to customers using the system) if it owned them. Latta's paid Management 10% of the original cost of the cameras which the parties believed was their then fair market value. A few leases were terminated before the end of the initial 36-month term. For example, one lease for an envelope inserter was terminated after only 2 years. Because the equipment was not working as anticipated, Latta's requested that the lease be cancelled. Management did not require Latta's to pay the remaining year's rent because Latta's leased replacement equipment from Management. On one occasion Latta's leased equipment directly from Xerox. That lease gave Latta's an option to purchase the equipment. When Latta's decided to exercise *182 the option, Latta's let Management buy the property which Management then leased back to Latta's. Management's leasing business during the years in issue was confined to leasing equipment and the building to Latta's. Latta's leased equipment only from Management except for certain equipment leased from Xerox as mentioned above. Latta's paid all rents promptly. Because of Latta's explosive growth, Latta's established a plant in Northridge, California, in 1967 and another plant in Atlanta, Georgia, in 1969. All equipment for these plants was also leased from Management. After Latta's opened its Georgia plant, Davis began traveling there frequently. In March 1970 he purchased a condominium apartment in The Dunes in Riviera Beach, Florida, for $ 46,000. This unit (hereafter referred to as "unit 1-C") had two bedrooms and two bathrooms. Unit 1-C was furnished by Davis and his wife, and was ready for occupancy in December 1970. In February 1971 Davis made a preconstruction purchase of another condominium ("unit 8-B") in The Dunes Towers, which was located several hundred feet from the building containing the first condominium. The price for this unit was $ 62,500. Construction *183 on unit 8-B was completed in February 1972 and Davis had that apartment furnished and ready for occupancy in January 1973. On July 20, 1972, Davis made a preconstruction purchase of a condominimum apartment in The Sea Grape, which was also located only a few hundred feet from the first condominium. This unit was sold in 1974. Davis entered into exclusive rental agreements for units 1-C and 8-B with Mr. Jack Jemison, the developer of the buildings. These rental agreements gave Jemison authority to rent the apartments at any time; Davis reserved no time for his personal use. Jemison's fee was 10% of the rent collected rather than a fixed fee. Neither unit 1-C nor unit 8-B was ever rented to anyone by Jemison. His efforts in attempting to rent the condominium were halfhearted. Moreover, the property owners' association of the Dunes, which was formed in 1970, promulgated very restrictive rules which made rental of units 1-C and 8B nearly impossible. Davis eventually ignored these rules in order to rent unit 1-C in 1974 to several of his friends from Cedar Falls. Davis frequently used unit 1-C after it was furnished. He would go to Florida from Latta's in Atlanta and spend *184 several days or a week at the condominium. The apartment was used by him during vacations. He preferred unit 8-B for his own personal use once that condominium was completed. Unit 8-B has never been rented. On their joint returns for 1970 and 1971 the Davises claimed net rental expenses in connection with unit 1-C of $ 2,257 and $ 3,462, respectively. On their 1972 return they claimed a net rental expense deduction of $ 4,423 in connection with unit 1-C and a net rental expense deduction of $ 4,785 in connection with unit 8-B. In the statutory notices, respondent determined that the amounts paid by Latta's to Management for rent under the equipment leases were not deductible rent since the "'lease' represented payments for the purchase of equipment." [4] Respondent further determined the amount of the depreciation which Latta's was entitled to deduct on the equipment which Latta's was deemed to have purchased. [5] Respondent also disallowed the Davises' claimed rental expense deduction for units 1-C and 8-B on the grounds that the losses were not incurred in transactions entered into for profit. *185 OPINION The first issue is whether Latta's, Inc. ("Latta's"), petitioners' subchapter S corporation, is entitled to deduct as a business expense under section 162[6] "rent" paid for the use of equipment. Latta's "leased" the equipment it used in its printing business from Control-O-Fax Management, Inc. ("Management"), which was owned by some of Latta's shareholders. [7] Petitioners contend that the leases were valid leases, and that Latta's is entitled to deduct as rent the payments made to Management pursuant to the leases. Respondent, on the other hand, contends that the payments are not deductible rent despite the "lease" form of the transactions but are, in substance, payments for the purchase of the equipment. *186 Section 162(a)(3) provides that "there shall be allowed as a deduction all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including * * * rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity." The question presented in this case is whether Latta's was renting or whether it was buying the equipment it used in its printing business. The answer to that question depends on the facts and circumstances surrounding the transactions in issue. Northwest Acceptance Corp. v. Commissioner,500 F. 2d 1222 (9th Cir. 1974), affg. 58 T.C. 836 (1972); Lockhart Leasing Company v. Commissioner,54 T.C. 301, 312-14 (1970), affd. 446 F. 2d 269 (10th Cir. 1971). The intent of the parties is an important factor to consider in determining whether a lease *187 or a sale has occurred. Western Contracting Corporation v. Commissioner,271 F. 2d 694, 699 (8th Cir. 1959); Oesterreich v. Commissioner,226 F. 2d 798, 801-02 (9th Cir. 1955). It appears from the facts established in this case that both Latta's and Management intended to enter into leases and not into conditional sales contracts. Latta's was expanding rapidly due to the development and sale of its pegboard accounting systems. On the advice of its banker, Latta's did not purchase fixed assets but, instead, decided to lease a new building and the needed printing equipment. Latta's needed to preserve its borrowing ability to procure expanded working capital and inventory. It also desired to maintain a sound financial statement, unclouded by debt on fixed assets, to assure its continued ability to borrow. Management, on the other hand, was established for the purpose of entering the equipment leasing business. It also built and rented the building Latta's moved into when Latta's needed larger quarters. Both Latta's and Management treated the transactions between themselves as leases on their books and records. See Benton v. Commissioner,197 F. 2d 745, 753 (5th Cir. 1952); *188 Lockhart Leasing Company v. Commissioner,supra at 308-309. The documents used to depict the transactions were leases in form. Title to the leased equipment remained in Management until the equipment was ultimately disposed of, whereupon the sales proceeds or trade-in value benefited only Management. Another reason Latta's leased rather than purchased equipment is that it made Latta's stock easier to value. Latta's desired to extend stock purchase opportunities to its employees; all its stock was owned by employees. Upon his retirement, an employee's stock was reacquired by the company. Leasing equipment, instead of purchasing it, made the stock easier to value since the company had fewer fixed assets to value. Moreover, it reduced the price an employee would have to pay to acquire a given percentage of Latta's stock. Accordingly, leasing facilitated the transfer of stock to key employees and its reacquisition on the employee's retirement. Moreover, the economics of the transactions indicate that the parties entered into leases and not sales contracts. See Frank Lyon Company v. United States,     U.S.    , 46 U.S.L.W. 4313, 4319 *189 (U.S. April 18, 1978). In Frank Lyon Company the state bank realized that it was not feasible because of various state and federal regulations for it to finance by conventional means a building under construction for its headquarters. It entered into sale-and-leaseback agreements by which the taxpayer took title to the building and leased it back to the bank for long-term use.The taxpayer obtained both the construction loan and the permanent mortgage financing. The bank was obligated to pay rent equal to the principal and interest payment on the taxpayer's mortgage, and had an option to repurchase the building at various times at prices equal to the then unpaid balance of the taxpayer's mortgage plus the taxpayer's initial $ 500,000 investment. Respondent took the position that the taxpayer was not the owner of the building for tax purposes, but that the sale-and-leaseback arrangement was a financing transaction in which the taxpayer loaned the bank $ 500,000 and acted as a conduit for the transmission of principal and interest to the taxpayer's mortgagee. The Supreme Court, in holding for the taxpayer, stated that *190 where * * * there is a genuine multiple-party transaction with economic substance, which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties.Expressed another way, so long as the lessor retains significant and genuine attributes of the traditional lessor status, the form of the transaction adopted by the parties governs for tax purposes. What those attributes are in any particular case will necessarily depend upon its facts. This case presents a situation analogous to that in Frank Lyon Company. As noted above, Latta's was not in a position to borrow the capital to purchase the equipment it needed and Management was. Not only did the shareholders of Management have some capital available to contribute to Management, but in addition the bank was willing to lend Management capital to purchase the leased equipment provided the leases were secured by the equipment purchased and by assignment of the leases to the bank. Accordingly, faced with *191 these economic realities, Latta's leased the needed equipment. The term of the leases was three years in every case without regard to the useful life of the equipment leased. It is normal for a lease to be for a period shorter than the useful life of the leased item. In this case, however, the rent for the first 3-year term equaled the purchase price of the equipment leased plus "interest." [8] Management believed it was important to recoup its cost and some profit during the first three years of the lease for two reasons. First, the continued growth and prosperity of Latta's pegboard accounting system depended in part on 3-M not entering into the same field. Latta's could not copyright its accounting forms or in any way protect this business from such competition. Secondly, the equipment leased was subject to both rapid depreciation and obsolescence. It depreciated rapidly because Latta's used it for more than 8 hours a day (generally for two shifts) and at speeds in excess of those recommended by the manufacturers.It was subject to rapid obsolescence because there were constant developments in printing equipment during this time. As a result, Latta's wanted new equipment *192 as its primary equipment and used older equipment subject to reduced rent as excess or backup equipment. Moreover, some of the equipment (what percent is unclear) continued to be used as primary equipment after the 3-year initial term. After the initial 3-year term, Latta's could continue to rent equipment subject to the leases on an annual basis for a reduced rent, i.e., 1/12 the prior annual rent. Management hoped this would encourage Latta's to keep the equipment at least for backup equipment. Management was not in the used equipment sales business, but when necessary did dispose of used equipment as profitably and easily as possibly. See Lockhart Leasing Company,supra at 302. Some equipment was traded in on new equipment. In every case the sales proceeds or trade-in value went to Management only. *193 None of the leases in issue contained options to purchase. Compare Quartzite Stone Company v. Commissioner,30 T.C. 511, 518-19 (1958), affd. 273 F. 2d 738 (10th Cir. 1959), with Arkansas Bank and Trust Co. v. United States,224 F. Supp. 171 (W.D. Ark. 1963). Moreover, Latta's was required by the lease to pay Management the fair market value of any lost or damaged leased equipment without regard to the amount of rent previously paid on such equipment. However, in view of the reduced rent after the initial 3-year term it is arguable that the sale occurred without regard to the absence of an option to purchase. Cf. Estate of Starr v. Commissioner,30 T.C. 856 (1958), revd. on other grounds, 274 F. 2d 294 (9th Cir. 1955) ("lease" of sprinkler system for annual rent of $ 1,240 for the first 5-year term followed by an annual rent of $ 32 for the second 5-year term held to be a contract of sale). We reject this conclusion. The rent charged Latta's by Management for both the initial 3-year term and the renewals was reasonable and normal in the leasing industry. Management and Latta's had looked into *194 the rents customary in the equipment leasing business and attempted to use such arm's length rents. See Western Contracting Company v. Commissioner,supra at 701.Management was particularly eager to use arm's length rents because it wanted to protect the minority shareholders of Latta's who were not also shareholders of Management. Moreover, comparable reduced renewal rental rates were commonplace in the leasing industry. Petitioners presented contemporaneous rate charts from major, independent leasing companies which show that both the initial term and renewal rentals charged by Management were competitive. All of the above factors indicate to the Court that the leases had economic substance. We are convinced on the basis of the evidence presented that the leases involved in this case are valid leases and not sales contracts. Having decided this issue for petitioners, we need not consider whether respondent correctly determined for depreciation purposes the useful lives of the equipment deemed to have been purchased by Latta's. The final issue is whether the Davises are entitled to various deductions in connection with their ownership of two condominium *195 apartments in Florida. Petitioners assert that the apartments were held primarily for rental purposes and claimed rental expense deductions consisting of expenses and depreciation. Respondent determined, however, that the apartments were held primarily for petitioners' personal use and enjoyment and disallowed the claimed deductions. Section 183 delineates the deductions allowed, if any, in connection with an activity not engaged in for profit. This section (effective for taxable years beginning after 1969) applies to the years in issue here. [9] In effect section 183 limits deductions to the amount of income from the activity. Petitioners realized no income from their condominium apartments during the years in issue, so are not entitled to any deductions on account of the apartments if ownership of the condominium apartments constituted an activity not engaged in for profit.An "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowed during the taxable year under section 162 (business expenses) or section 212(1) and (2) (expenses *196 for production of income and for management, conservation, or maintenance of property held for the production of income). Section 183(c). Deductions are not allowable under section 162 or section 212(1) and (2) for activities which are carried on primarily for personal pleasure or recreation. On the other hand, deductions are allowable under section 212(1) and (2) where property is held primarily for rental purposes. As this Court stated in Johnson v. Commissioner,59 T.C. 791, 814 (1973), affd. 495 F. 2d 1079 (6th Cir. 1974): * * * In determining whether the holding of property for rental * * * is a holding of property for the production of income within the meaning of section 212, the intention of the taxpayers as to the use of the property is of paramount importance. * * * If the predominant purpose and use of the property was for recreation, a hobby, or some other nonprofit motive, rather than to derive income, they are not entitled to the deductions claimed. * * * While the absence of a profit is not necessarily determinative, the operation must *197 be of such a nature that in good faith, the taxpayers could expect a profit. The issue is a factual one, and the burden of proof is on petitioners. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
In this case petitioners purchased three condominium apartments in Florida. They purchased unit 1-C in The Dunes in Riviera Beach, Florida, in 1970. Unit 1-C was furnished by petitioners and ready for occupancy in December 1970. In February 1971 petitioners made the preconstruction purchase of unit 8-B in The Dunes Towers, which was located several hundred feet from the building containing 1-C. Construction was completed a year later, and 8-B was ready for occupancy in January 1973. In July 1972 petitioners made another preconstruction purchase. This condominium was in The Sea Grape, which was also located only a few *198 hundred feet from the building containing 1-C. This condominium was sold in 1974; expenses relating to this condominium are not at issue here. Petitioners entered into exclusive rental agreements with Mr. Jack Jemison; these agreements gave Jemison authority to rent units 1-C and 8-B at any time. Jemison's fee was 10% of any rent received. Jemison never rented either of these condominiums to anyone. Neither condominium was rented until 1974 when petitioners rented 1-C to some of their friends from Cedar Falls.
Petitioners used 1-C for their personal purposes, including vacations, until 8-B was available at the beginning of 1973. Petitioners preferred 8-B which has never been rented.Petitioners did not rent 1-C to anyone until 8-B was completed. In light of all the facts, we conclude that petitioners have not proved that either 1-C or 8-B was held primarily for rental purposes during 1970, 1971 and 1972.In reaching this conclusion we rely primarily on the pattern of use for each of the condominiums. Petitioners used 1-C for their personal purposes until 8-B (which they preferred) was finished and ready for use in January 1973. It is possible that after 8-B was ready for *199 occupancy in 1973 they held 1-C solely for rental purposes. However, 1973 is not before us. As to 8-B, it was petitioners' favorite, and it has been used exclusively by them. It seems clear that 8-B was held by petitioners to be used for their vacation home, and they are entitled to no rental loss deductions with respect to it. Petitioners rely on Coors v. Commissioner,60 T.C. 368 (1973), affd. 519 F. 2d 1280 (10th Cir. 1975), cert. denied 423 U.S. 1087 (1976), as support for their claimed deductions. Coors is clearly distinguishable. In Coors the taxpayers contracted with a rental agency to rent and manage their apartment in Aspen, Colorado. The taxpayers paid a substantial fee to the agency whether or not the apartment was rented. Furthermore, the taxpayers did not use the apartment throughout the winter but reserved only two weeks per year for their personal use. In this case, in contrast, petitioners paid a fee to Jemison only if the condominiums were actually rented. In addition, during the years in issue petitioner T. Wayne Davis apparently used 1-C when he traveled from Iowa to Latta's facility in Georgia. The *200 apartment was also used by him during vacations. Merely listing 1-C for rent is not sufficient to establish petitioners' profit-seeking motive. See Carkhuff v. Commissioner,425 F. 2d 1400 (6th Cir. 1970); Newcombe v. Commissioner,54 T.C. 1298, 1300-1301 (1970). We conclude that petitioners have failed to carry their burden of proving that they held their Florida condominiums primarily for rental purposes during 1970 through 1972. Because the condominium apartments were held for personal pleasure or recreation, owning the apartments was an activity not engaged in for profit. No deductions are available to petitioners with respect to their apartments for expenses and depreciation since no income was generated by the apartments during the years in issue. Section 183(b)(2). Decision will be entered under Rule 155. Footnotes
1. The following petitioners are joined in this action under Rule 61(a), Tax Court Rules of Practice and Procedure: MARVIN H. KLEPFER and NEYSA I. KLEPFER, his wife; LOWELL L. THALMAN and MARGUERITE R. THALMAN, his wife; ESTATE OF MAE E. LATTA, Deceased, JOHN S. LATTA, JR., Executor, and JOHN S. LATTA, JR., individually; J. ROBERT POWERS and CECILE H. POWERS, his wife; ROBERT L. BEACH and BERDENA BEACH, his wife; ALLAN L. McENROE and LORETTA M. McENROE, his wife; ROBERT C. HILL and RUTH I. HILL, his wife; and WILLIAM E. PLANTAN and JOANNE F. PLANTAN, his wife.↩
1a. The Estate of Mae E. Latta is a party only by virtue of the fact that Mae E. Latta filed joint returns with her husband during the years in question. ↩
2. The shareholders of Latta's at the end of its fiscal years 1971 and 1972 were: Fiscal year ended March 26, 1971 Stockholder
No. Shares
Percent
T. Wayne Davis
673
30.5
Marvin H. Klepfer
378
17.1
Lowell L. Thalman
363
16.4
Mark W. Yaggy
163
7.4
John S. Latta, Jr.
189
8.6
Robert L. Beach
153
6.9
Robert C. Hill
133
6.0
J. Robert Powers
95
4.2
Allan McEnroe
46
2.1
William E. Plantan
17
0.8
TOTAL SHARES OUTSTANDING
2,210
100.0
Fiscal year ended March 31, 1972
↩ Stockholder
No. Shares
Percent
T. Wayne Davis
673
32.4
Marvin H. Klepfer
378
18.2
Lowell L. Thalman
363
17.5
Mark W. Yaggy
163
7.8
John S. Latta, Jr.
189
9.1
Robert L. Beach
153
7.4
J. Robert Powers
95
4.6
Allan McEnroe
46
2.2
William E. Plantan
17
0.8
TOTAL SHARES OUTSTANDING
2,077
100.0
3. Latta's sales of this new accounting method more than doubled from 1963 to 1965, redoubled from 1965 to 1966, and had redoubled again by 1968. From 1964 to 1970 sales increased more than ten-fold.↩
3a. Management estimated the useful life of the equipment as five years or less for 82 pieces of equipment, more than 5 but less than 10 years for 31 pieces, and 10 years or more for 60 pieces of equipment.↩
4. The portion of the monthly "rent" payments that was identified as "interest" was allowed as an interest deduction to Latta's and was determined to be interest income to Management. ↩
5. Correspondingly, Management's depreciation deductions were disallowed.↩
6. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue. ↩
7. Management's 4 equal shareholders were Davis, Thalman, Klepfer and Yaggy. For Latta's fiscal year ended March 26, 1971 they owned 71.4% of Latta's stock; for Latta's fiscal year ended March 31, 1972 they owned 75.9% of Latta's stock. In the prior year Latta's had 6 other shareholders and in the latter year 5 other shareholders.↩
8. One of Management's shareholders stated that the term "interest" was used on the leases for want of a better term at the time and was intended to represent Management's profit on the lease. We are not persuaded that the use of the term "interest" is significant or in any way is determinative of whether the leases were in fact sales contracts. See Northwest Acceptance Co. v. Commissioner,58 T.C. 836, 849 (1972), affd. 500 F. 2d 1222↩ (9th Cir. 1974) (lease using the term "interest" to represent the difference between the cost of the equipment and the total lease payments was held to be a lease and not a sales contract).
9. For years beginning after 1975 section 280A limits vacation home or dwelling unit deduction expenses where the owner uses it as a residence in addition to renting it out during the taxable year. It is used as a "residence" if personal use exceeds the longer of 14 days or 10% of rental use.↩